# DECISIONS

#### OF THE

# SUPREME COURT OF FLORIDA,

## AT TERMS HELD IN 1869-'70-'71.

————◄•►————

STATE OF FLORIDA *ex rel.* EDMUND C. WEEKS, VS. ROBERT
H. GAMBLE, COMPTROLLER.

Section 7, and Article V, of the Constitution of this State, provides that
" when any office, from any cause, shall become vacant, and no mode is
provided by this Constitution, or by the laws of the State, for filling such
vacancy, the Governor shall have power to fill such vacancy by grant-
ing a commission, which shall expire at the next election : " *Held,*

1. That the power vested in the Governor by this section is not a power
   to fill the office for the *unexpired term ;* that this power remains with
   the people, and that the power here conferred is to provide an incumbent
   for the office between the date of the removal or death of the regular
   incumbent, and the filling of the office by an election by the people.
2. That while the Constitution does not fix the precise time for the " next
   election," yet it is the duty of the authorities to see that the time of
   this election is not indefinitely postponed at the expense of the rights
   of the people.
3. Where provision is made by law for the salary of an officer, the draw-
   ing of a warrant by the Comptroller is a ministerial act, which may be
   enforced by mandamus, and the Court may, in such proceeding, deter-
   mine whether the appointment of the officer is void, where there is no
   other incumbent of the office exercising its functions by color of right.

Mandamus to the Comptroller of the State of Florida.

On the 24th of January, A. D. 1870, there being a vacan-
cy in the office of Lieutenant Governor of the State of Flo-

rida, the Governor of said State appointed and commissioned Edmund C. Weeks, the petitioner, as such Lieutenant Governor, who accepted, qualified and discharged the duties of said office for the first quarter of the year 1870. On the 7th of June, 1870, the petitioner made his requisition upon the Comptroller for his salary for the time stated. The Comptroller, denying that there was any power in the Governor of the State to make such appointment, refused to issue his warrant. On the 8th of June, 1870, Edmund C. Weeks filed his petition in this Court setting up the fact of the vacancy in the said office, his appointment to fill said vacancy, his qualification and discharge of its duties, the making of a requisition upon the Comptroller for his salary for the past quarter, and the refusal of the Comptroller to issue the warrant as required. In accordance with the prayer of the petition, an alternative writ was awarded returnable on the 9th of June. To this writ the Comptroller filed his return at a subsequent day of the term, setting forth that the Governor had not at the time of the said appointment power under the Constitution and laws of this State to fill a vacancy in the office of Lieutenant Governor.

The question involved in the issue made up, is the authority of the Governor to fill a vacancy in the office of Lieutenant Governor at the date of the appointment of the petitioner. That there was a vacancy in the office at the time was admitted.

*J. P. C. Emmons* for Petitioner.

The relation is full and certainly presents a *prima facie* case of right to the office.

The return denies the constitutional right to appoint. Issue taken.

The Relator cites art. 5, sec. 7, of the Constitution of the State, and Laws 1868, pages 2 and 3, 33 and 34.

If in the laws 1868, page 34, the exception precludes the

Lieut. Gov. as an *officer of the Legislature*, then there is no provision in that law, and the power of appointment is under art. 5, sec. 7, of the Constitution.

If the Governor had the power to appoint, the salary is fixed at $2,500, payable quarterly on the requisition of the Lieut. Gov.; sec. 6, art. 16, Constitution.

The act required of the Comptroller is purely *ministerial*.

The Comptroller had no discretion but to obey the direction of the Constitution. This, if the applicant had the right to demand it.

That a court having jurisdiction of the writ will inquire into that right, and give all the relief necessary, and even inquire into the act of the Governor in granting the commission, and sustain the ground taken by the relator, see Marbury vs. Madison, 1 Cranch, 137; Danley vs. Whitely, 14 Ark. 687; Collins vs. State, 8th Indiana, 345; 8 B. Monroe, 648, which is full, citing Divine vs. Harvey, 7 Mon. 439, Kendall vs. U. S., 12 Peters, 524, and Marbury vs. Madison, before cited, and reviewing them.

These cases seem fully to sustain the positions taken by the relator.

*George P. Raney*, for Respondent.

Section 7, article 5, Constitution, provides :

" When any office from any cause shall become vacant, and no mode is provided by this Constitution, or by the laws of the State, for filling such vacancy, the Governor shall have the power to fill such vacancy by granting a commission which shall expire at the next election."

The Relator relies upon this section for the validity of his appointment as Lieut. Governor by the Governor. Before the Governor can exercise the appointing power under this provision, there must be two concurring circumstances :

1st. There must be a vacancy.

2d. There must be the absence of any mode provided by

the Constitution *or* by any *existing law* for filling such va-- cancy. Clark vs. Irwin, 5th Nevada, 127, *et seq.* If either of these circumstances is wanting, the Governor cannot appoint.

It is admitted that there was a vacancy when the appointment was made.

Admitting that the *Constitution* does not provide a mode for filling such a vacancy as existed in the office of Lieutenant Governor when the Relator was appointed by the Governor to fill such vacancy, it is still submitted that the *laws of the State* did provide a "*mode*," and this mode, Respondent contends, should have been pursued in filling the vacancy. This mode is provided by the 4th sub-division of the 3d section of an act entitled "An act to provide for the Registration of Electors, and the holding of Elections," (p. 2 acts of 1868,) which is as follows: "When, in any other case of a vacancy, *not particularly provided* for, the Governor *shall* in his *discretion* direct, special elections shall be conducted and the result thereof canvassed and certified in all respects in like manner as general elections."

Here is a mode provided by "*the laws of the State*" for filling the vacancy.

Preceding paragraphs of this 3d section provide for filling. by *special election* all vacancies in all such State and County offices (except Governor and Lieutenant Governor,) as under our Constitution are elective. This 4th paragraph can then apply only to vacancies in the offices of Governor and Lieutenant Governor, and the office of Governor being filled, it could at the time of the appointment in question have applied only to a vacancy in the office of Lieutenant Governor.

The conclusion is that at the time the Governor appointed the Relator Lieutenant Governor, the laws of the State enacted under the Constitution (section 24, article 4,) did provide a mode for filling the vacancy, and that mode was a *special election* to be called *when the Governor in his discretion should direct.*

The peculiar discretion vested in the Governor as to call-ing the election is confined *to the time* when he shall call it. By an abuse of this discretion he may fail to call it *at all*, but this does not change the character of the discretion. .

It is not a discretion as to *whether the vacancy shall be filled by special election* or by *appointment.* The laws of the State provide for filling it by *special election*, and although this election is to be called at the Governor's discretion, yet the vacancy if filled must be filled by a *special election.*— The idea of filling it by appointment is repugnant to the char-acter of the office under the Constitution, and this office being one of the few elective offices under our system, it is to be presumed that the Legislature intended to preserve to *the people* the right of selecting its incumbent.

The vesting of this discretion finds some explanation in the fact that the ordinary duty of the Lieutenant Governor is merely presiding over the Senate during the session of the Legislature, and that should a vacancy in the office occur on the approach of a general election, it would be useless or im-politic to put the people to the expense and trouble of a special election in the meantime, particularly so should no session of the Legislature intervene. As to Mandamus vs. Comptroller 3 Florida, 206 ; Brashear vs. Mason, 6 Howard, 92 ; Decatur vs. Paulding, 14 Peters, 513.

WESTCOTT, J., delivered the opinion of the Court.

The principal question involved in this case is the extent of the power of the Governor under Sec. 7, Art. V, of the Constitution. This section is as follows :

" When any office, from any cause, shall become vacant, and no mode is provided by this Constitution or by the laws of the State for filling such vacancy, the Governor shall have the power to fill such vacancy by granting a commission, which shall expire at the next election."

It is evident that the first thing to be considered in the construction of this sentence is, at what period of time the

vacancy therein mentioned commences, and at what period of time, or upon the happening of what event, it ends. This being determined, if there is a mode provided by the Constitution or by the laws for filling the office during that period of time embraced between the commencement and the end of the vacancy, then it is plain that the Governor has no power to fill the vacancy; otherwise he has such power. The whole matter is therefore deducible to two questions:

*First.* What is the vacancy intended to be provided for by this section? What period of time does it embrace?

*Second.* Does the Constitution or the laws provide a mode for filling such vacancy?

The vacancy in this instance commenced with the judgment of ouster of the former incumbent. It is plain that the end of the vacancy, or, which is the same thing, the point of time at which the "commission" which the Governor "has power" to grant "expires," is the "*next election.*" The event, therefore, which gives us the time at which the power of the Governor ends and at which his commission expires, is the "*next election,*" and that as a matter of course must be the event which gives us the point of time at which the vacancy ends. It is for us to give a construction and fix the meaning of these words in the connection in which they stand.

The position taken by the relator in this case is that the "election" meant is the "election" to be held in A. D. 1872, for a Lieutenant-Governor, to hold his office for four years. It cannot be doubted that this is an election, but is it the "next" election contemplated by the Constitution?

The regular incumbent of the office of Lieutenant-Governor, the Constitution provides shall be chosen by the people. They are the power to which is confided the right of selection by that instrument, and any construction of the Constitution which restricts by implication the right to exercise the elective franchise in the selection of this officer, and ex-

tends executive power in that direction, is inconsistent with the intent and purpose of the framers of the Constitution in creating this office. Their view plainly expressed is that its incumbent should be the choice of the people. Says C. J. Parker, (Henshaw vs. Foster, 9 Pick. 317) : " In construing so important an instrument as a Constitution, and especially those parts of it which affect the vital principle of a republican government, the elective franchise, we are not on the one hand to indulge ingenious speculation which may lead us wide from the sense and spirit of the instrument, nor on the other to apply to it such narrow and constrained views as may exclude the real object and intent of those who framed it."

We must suppose that where there is a restriction upon the exercise of the elective franchise in reference to a matter which is generally made the subject of its exercise, that there was an anticipated evil or inconvenience not remediable by the exercise of the elective franchise, and the grant of power giving a remedy for this inconvenience should not be so construed as to postpone the selection by the people beyond a period at which it can be conveniently made. On the other hand, if there is in express terms this grant of power, we must not struggle to apply to it such narrow and constrained views as may exclude the real object and intent of those who framed it, and where there is in very words a grant of power which is vested to cure temporary inconveniences attending the selection of officers to fill vacancies in elective offices, we must, as judicial officers, acting independent of the prejudices of the hour, give it effect.

The question here submitted is very grave and important as to the present, and its ultimate consequences and effect in the future administration of the government is not less so. We cannot restrict our views to the present ; we must embrace the entire future, and our decision (except that it may determine this precise case,) is not of value equal to the paper which contains it, if it is not unbiased by any consideration

of expediency, policy, or emergency.   Applying the general
principles before enunciated as applicable to the construc-
tion of such a clause as this in a Constitution, it is plain that
the election contemplated by the Constitution is the next
election after the vacancy, and not the election which is to be
held to fill a new term to commence in A. D. 1872.   The
election contemplated by the Constitution is an election to
fill the balance of the *unexpired term*, which, in the absence
of legislation, the Governor should call at the first conveni-
ent season, and is in no sense an election to fill a *new and
another term*, which takes place without reference to the va-
cancy, under provisions of laws having nothing to do with
the subject of vacancies—laws enacted to fill regular terms
of offices created by the Constitution for the ordinary ad-
ministration of the government.   The power to fill the *un-
expired term* is a part of the original power of the people to
select.   The Constitution has simply carved out from this
original power a period between the date of the removal
and the " next election by the people," during which a tem-
porary power of the Executive is permitted to operate, so
that the public may not suffer.   There are many offices
which could not be vacant a week without serious conse-
quences.   Whenever there is an election by the people, the
constitutional term under this executive appointment " ex-
pires," because the vacancy contemplated by the Constitu-
tion is determined by the selection of an incumbent by the
original power.   It may be said that *the time* at which the
next election is to happen is not fixed by the Constitution.
True, the Constitution does not fix the precise time of the
election, but it fixes the " next election " as the limit, and it
is the duty of the authorities, independent of legislation, to
see that the period of this election is not indefinitely post-
poned at the expense of the rights of the people.   Because
the Constitution does not fix the time, affords no ground for
us on the one hand to extend the limit to a time which was
certainly not contemplated, or on the other hand to declare

that the Governor has no power in the premises. Whether it is within the power of the Legislature to fix *the time* of the election of this officer by the people at a date subsequent to the time at which elections are held throughout the State for officers to be voted for by the people of the State, or whether the Governor, under an act of the Legislature vesting a discretion, can so act as to postpone the election of the officer beyond such a period, are questions which do not arise in the determination of this case. For myself, I will remark that I cannot anticipate action so manifestly inconsistent with the spirit and intent of the Constitution, so in opposition to the true principles of republican government, upon the part of any officer of the government. I will further remark, that the discretion vested in the Governor under the act of 1868, is a sound discretion; one which should not be controlled by any other consideration than the right of the people to select this officer.

We have thus answered the first question necessarily involved in the construction of this clause of the Constitution, and the period of time embraced by the vacancy there contemplated is thus determined. I have never doubted that this was the meaning of the Constitution; not simply because it is the necessary result of the application of the true principles of construction, and results in vesting a power necessary to the due administration of the government, but from the additional fact. that the power which by this construction is vested in the Executive, has been exercised by the Executive of a State with a Constitution, precisely similar in effect to ours, for twenty years, and the additional fact that the courts of this State for the same period have time and again given the same construction that we give it.

Art. 8, Sec. V, of the Constitution of California, provides that " when any office shall from any cause become vacant, and no mode is provided by the Constitution and laws for filling such vacancy, the Governor shall have power to fill such vacancy by granting a commission, which shall expire

at the end of the next session of the Legislature, or at the next election by the people." It will be seen by a comparison of this clause with the corresponding clause in our Constitution, that the power as to vacancies in offices which are elected by the people, is precisely the same. The question which we are now considering first came before the Supreme Court of California (3 Cal., 503) in 1851. The Legislature in this case had created a judicial district appointing no judge therefor, and the Governor under this clause of the Constitution had made an appointment in May, 1851. At the general election in October of the same year another person was elected by the people. The appointee of the Governor claimed to hold for the balance of the unexpired term. The court say, this "section of the Constitution does not authorize the executive to supply the vacancy for the term. It contemplates that the people shall supply the balance of the unexpired term. The Constitution not authorizing the executive to fill the vacancy to the end of the term, this power must be exercised by the people. It is contended that the executive appointment should continue to the end of the term. This is not the language of the instrument, and we will not by implication confer that power upon the executive which is so repugnant to the spirit and policy of the Constitution. The words the 'next election by the people, mean the next election after the vacancy happens." This being the opinion of the court, the appointee of the Governor was ousted.

The views of the Supreme Court of California, in this case, have been reviewed by that court in a number of subsequent cases, and have been uniformly approved and followed. (1 Cal., 536, 26; 7 Cal., 525; 8 Cal., 19; 14 Cal., 188; 37 Cal., 621, 23, 24.) The court remark, in considering one of these cases, (37 Cal., 621,) that "the object of this clause was to prevent a public inconvenience, arising from the want of a party authorized for the time being to discharge the duties of a public office," and that "this power was vested in the

Governor to make merely a *temporary* appointment." In considering another case (14 Cal., 187,) the court remark, in reference to a vacancy in an elective office, " the Governor might fill the vacancy, but the appointee would only hold, by virtue of the appointment, until the next general election, or at most, until the qualification of the person to be then chosen by the people." It is entirely unnecessary to encumber this opinion with lengthy quotations from these opinions of the Supreme Court of California, extending over a period of twenty years, and made by judges of every shade of political opinion. They leave no doubt about the character of the power vested in the Governor under this clause, and we cannot see the least room for even a doubt upon this branch of the subject.

The only other State having a similar Constitution, so far as we have been able to ascertain, is the State of Nevada, and no decision covering this precise point has been made by its courts. Our opinion, therefore, is that the time covered by the vacancy which the Constitution authorizes the Governor to fill, is embraced between the death, resignation, or removal of the incumbent and the filling of the unexpired term by an election by the people, the purpose of the Constitution being to provide a person to discharge the duties during the interval.

In this case the vacancy is admitted; it is not set up that any such election has been held, and the only remaining question to be considered in reference to this branch of the case is, whether a mode is provided by the Constitution or by the laws for filling the vacancy.

The respondent has called our attention to the provisions of a law which authorizes the Governor to call an election to fill the office for the balance of the unexpired term ; (page 2, Acts of '68.) The election there authorized is the means by which the constitutional vacancy expires, and as a matter of course, the party there selected cannot fill the office for the time which precedes his election, and this is the time

during which the Constitution authorizes this appointment by the Governor. Our attention has also been called to the 2d section of the act of August 6, 1868, relating to vacancies, (acts of 1868, page 34.) If it is admitted that the Lieutenant-Governor is an officer of the Legislature, within the meaning of this section of the act, then no mode is provided for filling the vacancy, and the Governor's power attaches under the Constitution; and if the Lieutenant-Governor is not such officer, then the Governor might appoint under this act, in which event the commission could not extend beyond the time embraced in the constitutional vacancy. A member of the Legislature is not an officer within the meaning of this clause of the Constitution. The Lieutenant-Governor is an executive officer. He is not a legislative officer, although one of his functions is to preside in the Senate, and to vote in a certain event.

Is there a mode provided by the Constitution for filling the vacancy?

If, during a vacancy in the office of Lieutenant-Governor, the duties and functions of the office devolve by the Constitution upon another, either until the next election or for the balance of the term, there is no doubt that this is a filling of the vacancy within the meaning of the Constitution. This is settled by the authorities, (37 Cal., 621, 23, 24; 28 Cal., 390, 91, 92, and other cases there cited.) It is urged that the President pro tem. of the Senate discharges the duties and performs the functions of the Lieutenant-Governor when there is a vacancy in that office. This is far from being correct. The principal purpose for the creation of the office of Lieutenant-Governor is to perpetuate the office of Governor, which is essential to the due administration of the government. The Lieutenant-Governor is President of the Senate. In case of the impeachment of the Governor, or his removal from office, death, inability to discharge his official duties, or resignation, he discharges the duties of the office of Governor for the residue of the term, or until the disability

ceases. In case of the impeachment of the Chief Justice, the Lieutenant-Governer presides. The President *pro tem.* of the Senate would not, in the case of the impeachment of the Governor, discharge the functions of the office of Lieutenant-Governor to act as Governor, nor would he, in case of the lunacy of the Governor, or any other inability to discharge his official duties, perform the duty of Lieutenant-Governor to act as Governor during the continuance of this inability. The President *pro tem.* of the Senate, by the express terms of the Constitution, can " *act as Governor* " only " during *a vacancy* in the office of Governor," and impeachment only operates to disqualify from performing the duties of office, and does not create a vacancy. The Governor, when he legally acquires his office, and is eligible, has an estate in it as a property of which he cannot be divested, except by conviction upon impeachment; and we would have in this case a legal incumbent of the office, and a temporary disqualification to perform the duty. We do not see that this constitutes a vacancy in the office. How can there be an estate, a property in an office, in a person, and a contingent right to exercise all the authority attached to it, and yet the office be vacant ?

Chief Justice Murray, considering this clause of the Constitution in 2 Cal., 213, (whose views became the views of the court by the subsequent concurrence of Justice Heydenfelt, 2 Cal., 610,) says the terms " vacancy in any office from any cause," must be construed vancancies in *constitutional offices* from any cause which would operate a vacancy *under the Constitution,* and vacancies in offices *created by the Legislature* from any cause provided by law. " The rule is that constitutional offices only become vacant by some express provision of the Constitution, by death, resignation, or *removal by impeachment* for proper cause." (2 Cal., 213.) The language of the Constitution of California providing when the President *pro tem.* shall act as Governor, is precisely the same as that of Florida, except that the

words "President of the Senate" are used instead of the words "President *pro tem.* of the Senate." But if it is conceded that impeachment created a temporary vacancy in the office, certainly simple inability would not do so, and the right of the Lieutenant Governor to discharge the duty and perform the functions of the Governor in case of inability, would certainly not devolve upon the President *pro tem.* of the Senate in the event of a vacancy in the office of Lieutenant Governor. I cannot come to the conclusion that this partial performance by the President of the Senate, of the duties or functions of the office of Lieutenant Governor, is a filling of the vacancy within the meaning of this section of the Constitution. The result is that the Assembly, in the event it impeached the Governor when there was no Lieutenant Governor, would create a hiatus in this department of the government to the extent that the Governor is the sole representative of executive power. No law could be enacted, no fine could be remitted, no pardon granted, no commission could be issued ; in fact, we would strike from the government, in this contingency, one of its co-ordinate departments, and have a state of perfect disorganization, amounting to little less, if, indeed, it would not be a temporary suspension of the government by the destruction of one of its essential and necessary parts. It cannot be denied that the President *pro tem.* of the Senate would discharge *some* of the functions of the office, but certainly no candid mind would insist that this was a filling of the office within the meaning of the Constitution. Our conclusion is, that the Governor had authority to grant the commission in this case, to expire at the next election.

The only remaining question involved in this case is whether it is a case for mandamus.

The Comptroller has refused to draw his warrant in favor of the relator for his quarter's salary as Lieutenant Governor of Florida, and this proceeding is instituted by the relator to obtain a peremptory writ from this court directing

the Comptroller to perform this act. The Comptroller admits that at the date of the appointment of the relator there was a vacancy in the office of Lieutenant Governor, that the relator has a commission in due form signed by the Governor, that the amount claimed is legally due, if he is Lieutenant Governor. No question as to the eligibility of the party is raised, and it is not denied that there is an appropriation by law for the salary of the Lieutenant Governor. His sole reason for not issuing the warrant is, that in his opinion the Governor had no authority fill the vacancy, and the appointment is void.

An examination of the decisions of the Supreme Court of the United States in reference to the subject of mandamus, when officers of the Treasury Department are sought to be controlled in matters pertaining to the public money, will show such great difference in the opinions of the eminent jurists composing that court, such a diversity of views as to the extent of the jurisdiction of the courts, as well as to what constitutes a ministerial act as distinguished from an act involving discretion, that one seeking the true rule as established by this authority is left in great doubt.

In the case of the United States vs. Guthrie, 17 How., 303, the Chief Justice and three of the Associate Justices held that " no court has the power to command the withdrawal of money from the Treasury of the United States to pay any individual claim whatever." Mr. Justice Daniel, delivering an opinion which was concurred in by the Chief Justice and Associate Justices Wayne and Catron, remarks that " the only legitimate inquiry for our determination upon the case before us is this : whether, under the organization of the Federal government or by any known principle of law, there can be asserted a power in the Circuit Court of the United States for the District of Columbia, or in this court, to command the withdrawal of a sum or sums of money from the Treasury of the United States to be applied in satisfaction of disputed or controverted claims against the United States."

This question was answered in the negative. Of the five remaining justices, four concurred in the judgment upon other grounds, expressing no opinion upon this question, and one of the justices, (McLean,) dissented.

It would be difficult to reconcile these views of a minority of the court with the result of the views and judgment of the Supreme Court of the United States in the case of Kendall vs. Stokes, 12 Pet. 524. In that case, under a special act of Congress, a matter of controversy between Stokes and others and the Postmaster General was referred to a commissioner to examine the account and report any balance he might find due from the Post Office Department, and the Postmaster General was required to pay such balance by entering a credit on the books of the Department. The commissioner reported a balance in favor of Stokes. The Postmaster General refused to credit the whole sum. Stokes applied to the Circuit Court for mandamus directing the credit. Six of the judges of the Supreme Court held it a proper case for mandamus, and that the Circuit Court had jurisdiction.

In the case of the United States vs. Guthrie, the salary of the judge was fixed by law and an appropriation of salary made by law, and if payment of a sum admitted to be due by entering a credit in the case of Stokes was a ministerial act for the performance of which a mandamus would lie to an executive officer, I am unable to see any difference in principle when the payment of the salary of the judge was to be be made by drawing a warrant, as the entering the credit and the drawing the warrant are certainly equally ministerial acts. We cannot endorse the views of Justice Daniel in the Guthrie case, (representing a minority of the court,) as to the authority of the court in any event and under any circumstances to direct a payment of money. It is in conflict with the principles enunciated in the case of Stokes, which is a decision of the majority of the court, in our judgment, correctly settling the question.

In the case of Decatur vs. Paulding, 14 Peters, 521, the

relator sought a mandamus to control the action of the Secretary of the Navy to the end that she might be paid certain moneys which she alleged were due under an act of Congress. The payment of this sum was an act which involved upon his part, in the opinion of a majority of the court, the exercise of discretion and judgment in construing the resolution, and was a matter committed to his care in the ordinary discharge of his official duties. The court held that there *was no jurisdiction to issue the mandamus.* Mr. Justice Story and Mr. Justice McLean say nothing in reference to the question of jurisdiction, but remark that they cannot agree with " a majority of the judges who hold that the construction of this resolution was a duty in the discharge of which an executive discretion may be exercised. The law is directory and imperative, and admits of the exercise of no discretion on the part of the secretary. The amount is fixed by law and is therefore certain." Mr. Justice Baldwin, in a lengthy and able opinion, distinguished between jurisdiction and its erroneous exercise, holding that there was no doubt of the jurisdiction in the case, and holding further that the construction of the resolution must be decided by the court, not the Secretary, and that if the right to the sum existed by law, the payment was a ministerial act.

In the case of *ex-parte* Secombe, 19 How., the court denied that a mandamus could be granted to restore an attorney who had been disbarred without notice or hearing, intimating that the remedy was by writ of error. In *ex-parte* Bradley, the court restored an attorney to his office upon mandamus, deciding that the order disbarring him was not *reviewable by writ of error*, and that mandamus was the recognized remedy. These cases did not relate to the Treasury Department in any respect, and they are only stated to show the great difference in the views entertained by the eminent jurists composing that court at different times as to the office of mandamus.

3

In the State courts, I have found two cases where they have not hesitated to apply the remedy to a case of this character, (8 B. Mon., 649, 15 Iowa, 546,) where mandamus was sought to enforce the issuing of a warrant for the salary of a public officer, and both of these cases involved the question whether the relator was *de jure* the officer he claimed to be. In the case of Hardin the Governor had presumed to remove him from the office of Secretary of State on account of acts which the Governor decided constituted an abandonment of the office and had made an appointment to fill the vacancy. In the case of Bryan, the Governor had declared his office vacant for his failure to discharge its duties and had appointed another to fill the vacancy. In both cases, the question of the power of the Governor to fill the vacancy was examined, and in both cases warrants for the payment of money were directed to be issued. There is a difference between this case and these two cases. In the two cases cited there were actual incumbents other than the relator, claiming under color of right. In this case, the party who had been elected had been pronounced ineligible and judgment of ouster awarded against him by this court months before this appointment by the Governor. It is very doubtful whether the title to the office would be inquired into upon mandamus where there are conflicting claimants and a party other than the relator is actually filling the office. 5 Hill, 616 ; 3 Nev., 221 ; opinion of Justices Curtis, Nelson, Grier and Campbell, 17 How., 305.

In this case it is not denied by the respondent that the act which the mandamus is sought to enforce is a ministerial act. The sum due the Lieutenant Governor is fixed by law ; the Constitution provides that it shall be payable on his own requisition ; the Legislature has appropriated a sum to be applied to the salary of the Lieutenant Governor, and when the requisition is made (and it is admitted that it has been made in this case,) the Comptroller must issue his warrant. It is, however, entirely proper for the Comptroller, if he be-

lieves that the party is not *de jure* an officer, to decline to issue the warrant, not because the final decision of such a question as this is a function which appertains to him as an executive officer, but because, as a faithful guardian of the public treasury, he should require the decision of the question by that department of the government whose province it is to decide such a question of constitutional law before he will involve the State.

It must be obvious that if the Comptroller can, under these circumstances, finally decide such a question and the courts cannot control the matter, then the Comptroller cannot be compelled to perform a duty imposed by the Legislature, insisted upon by the Executive and determined by the Judiciary. He might refuse to pay any officer under any circumstances, and there would be no redress.

In such a case as this, the relator, unless he has a remedy by mandamus, has no remedy. By way of parenthesis we remark, that it is not intended by anything which we have written to say that a *de facto* officer discharging the duties of an office is not entitled to his salary, or to let the compensation of an officer depend in all cases upon the question whether he is *de jure* an officer. The determination of this question is not essential, as in any event the *de jure* officer would be entitled, and there is no *de facto* officer here, the former incumbent having been long since ousted by a *quo warranto* proceeding. For these reasons, therefore, unless there is something in the nature of this constitutional question which would prohibit the court from its consideration upon a mandamus, the remedy desired must be applied.

This brings us to the last question, viz: Can we enquire upon this proceeding whether the appointment of the relator by the Governor was void? In our opinion this is a question the determination of which is incidental to the decision of the principal question in the case, and as it involves the right of no party not before the court, we can determine

it.   Was there another party actually filling the office, who had been admitted and sworn and who was in by color of authority, it might be otherwise.   In the event it was alleged that the party was ineligible simply, we doubt whether this would be a reason to deny the salary, and for this cause we doubt whether we would inquire into that question upon this proceeding.   We do not doubt our authority to determine the question whether the appointment is void—an enquiry which, in our judgment, would be no bar to a *quo warranto* proceeding to determine the question of eligibility of the incumbent, or his title or right to an existing office.— We here simply enquire whether there can be under any circumstances an incumbent of such office by virtue of an executive appointment.   That the legality of such an appointment by the Governor can be enquired into, we do not doubt.   We do not think it is the province of the Governor to determine finally upon the question of his powers in a matter of this kind.   His action does not estop judicial enquiry, where it becomes the proper subject of consideration in a case involving individual rights.

We deem it proper in this connection to show the distinction between this case and the case of Towle vs. State, (3 Fla., 212,) as it might be supposed there was a conflict. In that case, the claim was for services rendered by a sheriff in a criminal prosecution by the State.   There had been no appropriation by the Legislature for the benefit of this particular officer for this special service, (6 How., 100,) nor had there been any action by the Legislature admitting that the costs there incurred in a prosecution for assault and battery were properly chargeable against the State in any event. The party attempted to coerce the officer to pay a sum which the State had never admitted was due.   The court in that case say that the remedy for the party was legislative action, and we cannot doubt that had the Legislature passed an act admitting the claim and making an appropriation for this particular service, the court, in the event of the

refusal of the Comptroller to draw his warrant, would have awarded a peremptory mandamus. Otherwise, the Comptroller's action is final, and neither the Legislature nor the courts can control him. He can refuse to pay any admitted indebtedness of the State, and its payment could never be enforced. There being no appropriation for this particular service, the State, through the Legislature, had not consented to the claim, and without such consent, any action of the court enforcing its payment by the officer would have been equivalent to sustaining an action by the party against the State, and giving a judgment against the State. It is well established that this cannot be done even where the State places herself in the attitude of a plaintiff and upon a plea of set-off a balance is found in favor of the defendant. (11 How., 272.) Where, however, the State consents to the claim as in this case, by action of the Legislature, the party has a right to the assistance of the court, which may compel the performance of a ministerial act necessary to satisfy the claim and to accomplish the purpose of the law.

The Supreme Court of the United States, speaking of this subject, (12 Pet., 611,) says: "The United States could not of course be sued, or the claims in any way enforced against the United States, without their consent obtained through an act of Congress." If the consent by the Legislature was to pay a claim which the Constitution prohibited, that would be an argument against our granting the writ, but no question of this kind is raised here. To make the cases analagous we should have had legislation admitting the claim of the sheriff, in the event he was a sheriff. Had this been the case, and the Comptroller had denied that the party was *de jure* sheriff, and placed his refusal upon this ground, the cases would have been analagous. The question would then have been whether the courts were not the proper tribunals to determine whether the party was not sheriff, and in the event he was, whether they could not compel the Comptroller to draw his warrant for a certain sum admitted by the

Legislature to be due. In the absence of legislation or of constitutional provisions of this character, it is not denied that the Comptroller's action in reference to a claim is final. This is an exercise of judgment and discretion which properly appertains to him, and we cannot control it, but where the Legislature has acted, he has no such discretion. If he refuses to pay the claim, the party must go to the Legislature.

It may be remarked that the extract made in the case in 3 Fla. by Chief Justice Douglas from the opinion of Mr. Justice Catron, in the case of Decatur vs. Paulding, does not represent the views of the Supreme Court of the United States. In that case, Mr. Justice Catron dissented from the opinion of the court, and there as elsewhere he maintained that the courts could not by mandamus compel an officer to perform a ministerial act, because if it had jurisdiction to determine what constituted a ministerial act as distinguished from an executive duty, there was no obstacle to its making all executive duties ministerial acts, having the power to define them. Nor do we think that the remark there made by Mr. Justice Catron in reference to the case of Kendall is correct. The court do not in the case of Kendall say that public money could not be reached by mandamus. Mr. Justice Thompson, speaking for the court, says in the case of Kendall, that in the event a balance was found in favor of Stokes, "it could not have been drawn out of the Treasury without further legislative provision"—which is far from saying that if such legislative appropriation had been made, and the auditing officer had refused to pay, that a court could not compel the issuing of the warrant and thus reach public money through a mandamus.

Our conclusion is that a peremptory mandamus must issue.

Hart, J.

In the matter of the application of Edmund C. Weeks for mandamus to the Comptroller for his salar yas Lieutenant-

Governor, the Comptroller answers, in substance, that Weeks is not such officer, and that the Governor had no authority to grant the commission; that another man claimed salary for the same office, and that the Senate, at the recent session of the Legislature, refused to recognize Mr. Weeks as its presiding officer.

Here is a conflict by a subordinate officer of the executive department against the action of its head, the Governor, who granted this commission. This application for mandamus is not, in my judgment, the proper legal proceeding provided in the system of government for ascertaining by what authority the holder of the commission claims the office. In this way, the Comptroller by refusing to act upon the quarterly requisitions by the officers for their salaries, might claim authority independent of the head of the department to which he belongs, or even of any other department, to decide and determine such questions. There is no such authority vested in that officer.

If any person desires to have such questions legally decided, the regularly established mode of doing so is always open to him. An attempt to procure the decision of such questions by setting them up outside of his department, and collaterally, tends to involve legal proceedings—correct legal remedies—in confusion and uncertainty, to the detriment of consistency in the administration of the law.

When the Hon. David S. Walker was Governor, he appointed a Comptroller. A committee of one branch of the Legislature was sent to inquire of him by what authority the appointee claimed the office. This was not the method provided by law for testing the matter, and the Governor correctly enough answered that he claimed it by authority of a commission which he had granted to him. The committee reported, and the matter ended there.

If the appointee was not legally appointed; if the Governor exceeded his authority, and violated the law in making the appointment, there was a mode provided by law for

having it enquired into, and the claimant ousted. If questions of this kind are allowed to be tested in the manner attempted in this case, insubordination and confusion might follow, to the great embarrassment of government. A decision tending to oblige the Governor to obtain the opinion of the Comptroller upon the legality or illegality of an appointment by his commission before he could make it to be useful, could not be in harmony with the system of government established by the Constitution.

All the official acts of the Governor should be considered legal, respected and obeyed, until decided by the constitutional tribunal to be illegal.

The answer, that another man claimed salary for the same office, and that the Senate refused to allow Mr. Weeks to preside over it, sets up matter that might perhaps embarrass the minds of some Comptrollers; but this is not the tribunal for that officer to bring his doubts to in this manner for solution, since he cannot thus do so without conflict with and wholly ignoring the Governor of the State, the head of the department to which he belongs, and who is responsible for the faithful execution of the laws.

In my judgment, therefore, the enquiry into the legal authority of the Governor to grant the commission exhibited, and into the legality of the action of the Senate, and of Mr. Gleason's application for salary, ought not to be made in this case. That the reasons given by the Comptroller for his refusal to act upon the applicant's claim for salary, are in their nature collateral to the proper issue, irrelevant and insufficient; and that the peremptory writ should issue.