THE STATE OF FLORIDA EX REL. FRANCIS P. FLEM-ING, GOVERNOR, PLAINTIFF, VS. JOHN L. CRAW-FORD, SECRETARY OF STATE, DEFENDANT.

1. The performance of a clear ministerial duty may be required of the Secretary of State by mandamus.

2. Neither the Secretary of State nor the Supreme Court of Florida has power to pass upon the legality of an election of a United States Senator by the Legislature, or of an appointment of a Senator by the Executive of the State. The power is in the United States Senate alone.

3. The commission of a United States Senator appointed by the Governor should be signed by the Governor and sealed with the Great Seal of State, and countersigned by the Secretary of State, in accordance with section 14, Article IV of the Constitution of this State.

4. Where there has been an election of a United States Senator by the Legislature and afterwards the Governor, holding that there is a vacancy in the office on account of the illegality of such election, signs and appointment or commission of a United States Senator and requests the Secretary of State to seal the same with the Great Seal of State, and to countersign it, it is the duty of the Secretary to do so, and he has no right to refuse because he deems the Governor's action illegal. If he refuses the performance of the duty it may be required by mandamus.

5. A commission is not complete until it has been signed, countersigned and sealed in accordance with section 14 of Article IV, nor is a copy of an uncompleted commission, or of the record thereof, evidence of any appointment to office.

6. Affixing the Seal of State to an executive appointment of a United Senator and countersigning the same does not commit the Secretary of State to the legality of such appointment. It implies no opinion as to the legality of either such appointment or of a previous election of another person to the same place by the Legislature.

7. The commissioning of a United States Senator or other public officer is a matter of public interest, and it is the duty of the Executive to see that his commissions of persons appointed to office are completed, and as the Chief Magistrate, charge with seeing that the laws are faithfully executed, he is a proper relator in a prooceeding by mandamus to require the sealing and countersigning of a commission.

This is a case of original jurisdiction.

### STATEMENT.

The alternative writ, the declaration in causes of this character, states in substance that on the 22d day of

September, of the present year, the relator, Francis P. Fleming, the Governor of this State, he having ascertained and determined that a vacancy existed in the office of United States Senator from this State, did, in exercise of the power conferred upon him by law, proceed to appoint Robert H. M. Davidson, a citizen of the State, having all the legal qualifications for such office, to be United States Senator from Florida, to fill such vacancy until the meeting of the next Legislature; and that to evidence and give effect to such appointment, the petitioner prepared and signed an appointment or commission in the words and figures following, to-wit:

In the name of the State of Florida. To all whom these presents may come, Greeting:

WHEREAS, the term of office of Wilkinson Call, as United States Senator from Florida, expired on the third day of March, A. D. 1891, during the recess of the Legislature of said State, whereby a vacancy then happened in the office of United States Senator from Florida during such recess as aforesaid; and whereas, a senator has not been chosen by the Legislature of the State of Florida to fill such vacancy, and whereas, the Legislature of the State of Florida is not now in session, and a recess thereof exists at this time.

Now, therefore, I, Francis P. Fleming, Governor of the State of Florida, by virtue of the authority in me vested by the Constitution of the United States, have appointed, and by these presents do hereby appoint Robert H. M. Davidson to be United States Senator

from the State of Florida, until the next meeting of the Legislature of the State of Florida.

In testimony whereof, I have hereunto set my hand and caused the Great Seal of the State to be affixed at Tallahassee, this twenty-second day of September, A. D. one thousand eight hundred and ninety one, and of the independence of the United States, the one hundred and sixteenth year.

FRANCIS P. FLEMING,

Governor of Florida.

Attest :

Secretary of State.

That thereupon the said Governor caused the said appointment or commission to be transmitted to the defendant, John L. Crawford, Secretary of State, of this State, and instructed and directed him to seal it with the great seal of the State and to countersign the same as a due and proper attestation of the executive act of such appointment, to be delivered to said Davidson as his full and complete appointment to be such United States Senator, and the evidence thereof, but that the said Crawford, Secretary of State, in disregard of his duty in the premises, failed and refused to seal the said appointment or commission with the great seal of the State and to countersign the same, and has failed and refused and still refuses so to do, to the great prejudice and injury of the people of the State.

That afterwards, on or about October 13th, 1891, the said Governor required and instructed William B. Lamar, the Attorney General of the State, to institute proceedings in this court to procure the writ of mandamus to require the said Secretary of State to seal such appointment or commission with such seal and to countersign the same, but the Attorney-General has failed and refused and still refuses to institute the proceedings.

The writ then recites the prayer of the petition : that, in order to protect and secure the public interests in the premises, and to enforce and carry into effect his said executive act as such Governor, the writ may issue, and in compliance with such prayer, directs the Secretary of State to seal and countersign the said appointment or commission, or to show cause on the day and at the time mentioned therein, why he had not done so.

On the 29th day of October, at the time stated in such writ, the Secretary of State made return to such writ, stating in effect:

1st. That this court has no jurisdiction of the respondent on the case made by the writ in respect to the specific act sought to be enforced.

2d. That the relator, the Governor, has no such interest in or relation to the specific act sought to be enforced, upon the allegations of the writ, as au-

thorizes or justifies him in instituting this proceeding.

3d. That the State has no such interest in or relation to the specific act sought to be enforced, upon the allegations of the writ, as authorizes the institution of the proceeding by the State, or on its behalf, or by or on relation of the Governor of the State.

4th. That there is no law enjoining upon this respondent the performance of the specific act sought to be enforced.

5th. That it does not appear that the performance of the specific act therein sought to be enforced is necessary to make effectual the alleged appointment.

6th. That the allegations of the writ are not sufficient to show that the relator has a right to enforcement of the specific act sought to be enforced.

7th. That the petitioner is now and was on September 22, 1891, Governor of the State. That defendant has no means of knowing, and does not know, whether on or before the day mentioned the petitioner claimed to have ascertained and determined there was a vacancy in the office of United States Senator from the State of Florida, nor the several grounds, methods and processes upon and through which such alleged ascertainment and determination was had, other than as proclaimed by said petitioner to the people of Florida, under a writing made and published by him on the 4th day of August, of the present year, a

copy of which writing is annexed as a part of this re turn, for the purpose of showing merely the claim therein set up and the alleged grounds and the rea- soning upon and by which the alleged ascertainment and determination was reached.

That no vacancy in the office of United States Sena- tor existed on the said 22d day of September; that "theretofore" the vacancy created by the expiration of the term of office of Wilkinson Call, United States Senator, had been filled by the Legislature of the State, by whom Wilkinson Call was duly and constitutionally elected United States Senator, " as shown by a duly certified copy of said legislative proceedings," filed as a part of the return, and that Wilkinson Call applied for and obtained from the respondent a duly certified copy of said proceedings, to be presented to the Senate of the United States, as the due and legal evidence of his election as such Senator.

That it is true that the Governor did prepare and sign "the document in writing," a copy of which is set out in the alternative writ, and thereupon caused the same to be transmitted to respondent with instruc- tions to him to seal with the great seal of State, and countersign the same, and that this respondent refused so to do.

That the communications and transactions by and between the Governor and the Attorney-General, con- stituting the formers's alleged demand, and the latter's

alleged refusal, to institute proceedings to procure from this court the writ of mandamus for the purposes alleged, were conducted in writing, and a copy of the same is annexed as a part of the answer.

All of this return, except the paragraphs numbered from 1 to 6, inclusive, was demurred to as not setting up facts sufficient in law to bar the writ, and the six paragraphs were treated as a demurrer, and the demurrer joined in.

The other facts in the case are stated in the opinion of the court.

*Fred. T. Myers* for Plaintiff.

This is a petition for a writ of mandamus to compel the Secretary of State to affix the great seal of State to and to countersign the appointment or commission of Robert H. M. Davidson as United States Senator by executive appointment.

The Constitution of the United States, Art. 1, Section 3, subdivision 2, provides with respect to vacancies as follows : "If vacancies happen by resignation or otherwise, during the recess of the Legislature of any State, the executive thereof may make temporary appointment until the next meeting of the legislature which shall then fill such vacancies."

The power to appoint when a vacancy occurs having been conferred upon the executive and no method of

declaring vacancies being provided, it devolves upon the executive to determine when to exercise the power of appointment.

This position is emphasized by the fact that a resignation of the office of Senator, which is one of the ways expressed in the Constitution by which a vacancy may occur, must be to the executive of the State and not to the senate.

When the executive has determined that a vacancy exists and made an appointment, the court cannot, in a mandamus proceeding, go behind the appointment to examine the proof on which the Governor acted in making the appointment. State ex rel. Vienee vs. Hyans, cited in Wrotnowski vs. State, 17 La. Ann.

When two commissions duly authenticated for the same office are extant, and it becomes necessary to determine which of two appointees is legally entitled to the office, that issue presented in a proper manner and at the proper time can be entertained by the courts, but the courts will not inquisitively seek to know upon what evidence the executive acted in the performance of a constitutional duty, at all events, in advance of the consummation of an official act. State vs. Wrotnowski, 17 La. Ann; High Ex. Rem. Sections 11 and 61; Bisbee vs. Alachua Co., 17 Fla.

2d. The power to appoint being vested in the executive, the power to evidence the appointment, by a formal instrument or commission in the name of the State follows as an incident.

An executive appointment is not complete until signed by the Executive and sealed with the seal of State. Marbury vs. Madison, 1 Cran.; U. S. LeBaron, 19 How., 73; Conger vs. Gilmer, 32 Cal., 75; Cornwell vs. Allen, 21 Ind. 521; Justices vs. Clark, 1 T. B. Mon. 82; People vs. Whitman, 10 Cal, 441; Meacham on Public Officers, Sec. 114.

Art. IV, Sec. 14 of the Constitution of Florida, provides as follows :

All grants and commissions shall be in the name and under the authority of the State of Florida, sealed with the great seal of the State, signed by the Governor and countersigned by the Secretary of State.''

Sec. 21 of same article provides that the Secretary of State shall keep the records of official acts of the Executive Department of the Government; and shall be the custodian of the Great Seal of State.

Sec. 1 of the same article provides that ''The Supreme Executive power of the State shall be vested in a Chief Magistrate who shall be styled the Governor of Florida.''

Sec. 2, page 933, McClellan's Digest, provides that the Secretary of State shall record all official orders, acts and proceedings of the Governor, and the Governor before the issuing of any order, or transmission of any document from the executive office, or promulgation of any official act, shall deliver the same to the Secretary of State to be recorded.

The seal of which the Secretary of State is made the custodian is the seal of the State. The Supreme Ex-

ecutive authority of the State Government is in the Governor. The acts of the Governor in the perform ance of his legal duties as Chief Magistrate are acts of State, and to give them verity as such with other States, or governments, the seal of State is necessary.

"The public seal of a foreign State proves itself; and public acts, decrees and judgments exemplified under this seal are received as true and genuine." Bouv., Law Dic., Seal; 2 Cranch, 238; 7 Wheat., 273-335; 2 Conn., 85; 6 Wend., 475.

Under the common law the creation and disposal of offices was a prerogative of the king. "For," as Blackstone says, "honors and offices are in their na ture convertible and synonymous. All offices under the crown carry in the eye of the law an honor along with them; because they imply a superiority of parts and abilities, being supposed to be always filled with those that are most able to execute them. And, on the other hand, all honors in their original had duties or offices annexed to them: an earl, *comes*, was the con servator or governor of a county; and a knight, *miles*, was bound to attend the king in his wars. 1 Black., 271-2.

Offices were, at common law, incorporeal heredita ments and lay *in grant*. 2 Black., 36-37; 1 Black., 271; Bacon's Abrg., Title Office.

Grants or letters patent must first pass by bill: which is prepared by the attorney and solicitor-general in

consequence of a warrant from the crown; and is then signed, that is, subscribed at the top, with the king's own sign manual, and sealed with his privy signet, which is always in the custody of the principal Secretary of State; and then sometimes it immediately passes under the great seal, in which case the patent is subscribed in these words, "*per ipsum regem*, by the king himself."

Under our form of government the people, or the people as represented in the State, stand in lieu of the king. The people create the offices; and bestow them either directly by election, or indirectly by appointment. When by appointment, it is because the people have delegated the power, but still the right to the office proceeds from the people. It is, therefore, provided in the constitution of our State that grants and commissions must be in the name and under the authority of the State of Florida. Whether the people elect or the Governor appoints, the letters patent issue under authority and in the name of the State.

The power to appoint to fill a vacancy in the U. S. Senate, conferred on the Governor by the Constitution, gives him, as the Chief Magistrate of the State, the right to name the person, but the right to the office proceeds from the right of the State to be represented in the Senate of the federated States; and the commission or letters patent to the office should be in the name of the State and under the seal of the State.

The following are definitions of the word "commission" given by the different authors of standard legal dictionaries :

Bouvier. "Letters-patent granted by the government under the public seal to a person appointed to an office giving him authority to perform the duties of his office."

Abbott. "Formal written authority; a document issued by government conferring powers; as the commission of an officer, or of a vessel of war; a commission to take testimony."

Anderson. "Formal authority from a government for the doing of something belonging to the exercise of its powers."

"Imports *ex vi termini* written authority from a competent source."

3rd. As to the right of Governor to be relator. High on Ex. Rem., sec. 431; High on Ex. Rem., sec. 433; Holland vs. State, 1 So. Rep. (Fla.), 526; McConihe vs. State ex rel., 17 Fla., 271; State ex rel. Bisbee vs. Bd. Comrs. Alachua co., 17 Fla., 14.

See also, 7 Iowa, 186; 37 N. Y., 344; Co. of Pike vs. the State, 111 Ill., 202; Hamilton vs. State, 3 Ind., 452; People vs. Collins, 19 Wend., 56; City of Ottawa vs. People, 48 Ill., 233.

As to ministerial character of duty required of Secretary of State and mandamus being proper remedy, see

State vs. Wrotnowski, 17 La. Ann.; Marbury vs. Madison, 1 Cranch.; State ex rel. Drew vs. Canvassers, 16 Fla.

*A. W. Cockrell & Son* for Defendant.

"There seems to be the same irreconcilable conflict of authority in reference to the question whether or not *mandamus* lies to compel other executive officers of State to perform official duties that there is in reference to the question whether *mandamus* will issue against the Governor. In some States it is held that the writ will not be awarded by the courts against any officer of the executive department: Commonwealth vs. Wickersham, 90 Pa., St. 311 ; Bledsoe vs. International R. R. Co., 40 Tex., 537. While in others it is held that *mandamus* will lie to compel an officer of the executive department of the State to perform a duty imposed upon him by law, where such duty is purely ministerial in its nature, and its performance is demanded by the public interest: State vs. Hobart, 12 Nev., 408; State vs. Hayne, 8 S. C., 367." Dane vs. Derby, 89 Am. Dec. (note), 734.

In Florida it is held that the constitutional provisions securing independence of action in the official relation of co-ordinate departments of the State government forbids the courts from issuing a mandamus to the Executive: State ex. rel. Bisbee vs. Drew, 17 Fla., 67. Wescott, J., dissenting, insisted that under such a construction, the writ could not lie to the heads of

the executive departments. In those jurisdictions, however, where this writ has been allowed to the heads of the executive department, the universal, invariable limitation *confines* the operation of the writ to the enforcement, by mandamus, of the performance of an *unquestionable, legally defined* duty. Bressler vs. State Treasurer, 26 N. W. Rep,, 825, S. C., 60, Michigan, 40; Dement vs. Rokker, 126 Ill., 174.

And so stringent is this *limitation*, so uniform of application, it has become a principle of pleading in mandamus, that "in *every case* it must appear that the defendant is under a legal obligation to do and perform the act sought to be coerced, and the writ must aver every *material* fact required to show the existence of this obligation." The People vs. Beard, etc., 125 Ill., 334.

In alignment with this view, in State ex rel. Clarke vs. Board of H., 8 Atl. Rep. 509, S. C., 49 N. J. L., 349, it was held, that proof of an appointment by the president of a council claiming to act as mayor, and of confirmation by council, will not be sufficient; but it must appear the fact existed upon which the right of the president to nominate arose. Says the court: "The claim on behalf of Clarke is that the *mandamus* asked for must issue because he has shown a nomination by the president of council, claiming to be acting mayor, and a confirmation by council. It is insisted that he thus shows a *prima facie* title which must be conclusive on this application, because the proceedings giving him title cannot be attacked collaterally."

"The charter has not provided for the issuing of a commission or a certificate of appointment of a member of the board of health, nor has it declared what shall be evidence of the title to such an office. The case differs from those where the contest relates to an election when the law provides that the certificate of an election board or board of canvassers shall be evidence of the result. Therefore the certificate of the clerk presented by Clarke to the board of health, apart from the fact that it certified to an election by council when the office was not capable of being filled by election, had no force as evidence. Nor would the minutes of council have proved more than the act of that body. The evidence of title would seem to consist of the communication whereby the nomination was made, and the minutes of council containing the vote of confirmation."

"The contention that a nomination by an acting mayor, and a confirmation by council, make out a title which we must accept as conclusive on this application, cannot, in my judgment, be sustained. If the charter provided for issuing a commission or certificate evidencing a right to membership in the board of health, such a contention might be sustained. Perhaps an appointment by the mayor and confirmation by council might constitute a conclusive title; for the official station of the mayor creates, *ipso facto*, his official power to nominate. But the president of the council derives his right to nominate, not alone from his official station, but also from the existence of one

of certain specified contingencies. In the absence of any such contingency, he has no more right to nominate than a private citizen, and his act in nominating would be a mere nullity. The charter makes no provision, as perhaps might be judiciously done, for establishing the existence of such a contingency as would confer power on an acting mayor."

"In these circumstances, what proof is required to establish a title to office acquired by such an appointment? Neither the researches of counsel nor my own examination have disclosed any adjudged case bearing on the subject. But, looking at the fact that the authority of an acting mayor depends on an antecedent condition, I have been led to the conclusion that, to establish a title to office derived from his nomination, his right to nominate must be first proved. The result of this conclusion will be to discharge the rule; for as will appear, the title of Clark has not been thus proved."

And so, in Beecher's Breese, Ill. Rep., 104, the court says: "But the counsel for the relator contended on the argument, that whether the lieutenant-governor had the constitutional right or not, to make the appointment, still the secretary was compelled to countersign the commission and affix the seal. Can this proposition be sustained? By the 4th section of the act defining the duties of secretary of state, it is enacted, 'That all commissions required by law to be issued by the governor, shall be countersigned by the

secretary of state.' In this section is to be found the duties of the secretary. Had the legislature intended to require the secretary to countersign every commission that the governor should present to him, whether authorized by law, or the constitution, its phraseology would have been, that the secretary should countersign *every* commission presented to him by the governor. The secretary is, however, *only* required to countersign those commissions 'required to be issued by law.' Must he not, then, look into the law to see if the commission is required by law? Would he be required to sign a commission for an office that does not exist?''

The proposition, underlying these authorities, is that the obligation to seal and countersign a commission enforceable against the secretary of state by a mandamus, is created by the *law* defining *his* official duties; the proposition, upon which the writ in the case at bar proceeds, is that it is the duty of the secretary to attest *every* commission the chief executive may demand of him; he shall seal and countersign. The writ is so constructed that so far from making issuable and traversible the existence of a vacancy, upon which *alone* the right of the governor to appoint, can be legally predicated, it seeks to avoid that issue, and place beyond the inquiry of the court, whether or not a vacancy did in fact exist, when the alleged appointment was made.

The distinction between the proposition thus asserted by the adjudications, and the proposition relied on to sustain the writ, traces with precision the exact line of separation between a government of law, and a personal government, the demarcation between a well defined rule, and arbitrary power.

If it be that the secretary is not, as matter of law compellable to seal and countersign *every* commission *or* appointment the Governor may make demand upon him, to seal and countersign, the question recurs, just as it recurred in Ewing vs. Forquer, and demands solution before the final writ can be awarded in this case, "has the appointment been made by a power competent to exercise the right of appointment at the time it was made."

The power, if it exist, is conferred *not* by the authority, and under any law, of the State of Florida; it is conferred solely by the Constitution of the United States—the supreme law of the land—and in and by the following: "And if vacancies happen by resignation or otherwise, during the recess of the Legislature of any State, the executive thereof may make temporary appointment until the next meeting of the Legislature, which shall then fill such vacancies." Art. 1, sec. 3, sub-section 2, Constitution of the United States.

The contention of the Executive, upon which he claims a vacancy existed September 22nd, 1891, is based upon the alleged fact that the Legislature upon whom

primarily was put the duty of choosing a Senator, did not elect a Senator. This contention rests upon the proposition that the act of Congress, sec. 15, Rev. Stat. U. S., requires that a majority of each house, in its capacity, as organized under the Constitution of the State to transact business, is necessary to constitute a quorum of the joint assembly authorized to elect a Senator. If this be true, the recorded proceedings of the Legislature show there was a failure of election. And upon such a postulate, alone, can a vacancy be predicated.

Conceding now in the purview of this special phase of the argument, that *this* court may act judicially upon this contention, and determine, for the purposes of this writ, the legal existence *vel non* of a vacancy, let us ascertain from the language, and context, of this sec. 15.

1. What the Congress meant, in the enacting of this statute; and

2. Whether it was within the competency of the Congress to so legislate.

We submit there is no ambiguity in the language employed. Its object was to secure uniformity in all the States in the election of Senators, that the questions and differences which theretofore existed might be avoided. This legislation originated in the Senate—Senate bill No. 414. The bill as introduced provided that the joint assembly shall continue to vote for

Senator, without interruption by other business, until a Senator shall be elected. Speaking to this *original* bill, Mr. Reverdy Johnson, of Maryland, said : "The first section of the bill provides that each house is to vote by itself. The Senate are of course aware that in the beginning—and the same opinion continued to be entertained a good while after the Constitution was adopted—it was very much doubted by some of the very best men of the country whether any election could be made by the Legislature in any other way than by the votes of both branches acting concurrently where the Legislature of the State consisted of two bodies. The language of the Constitution is that 'the Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof.' I do not speak with certainty, but either Chancellor Kent or Mr. Justice Story, in his Commentaries, has said that it was exceedingly doubtful whether the true meaning of that provision is not that the choice is to be made by the Legislature legislatively, and of course that they are to act in the way in which they are alone authorized to act by their State Constitutions under which they exist in the passing of laws. Whether the doubt was originally well founded I am not prepared to say; I rather think it was; but the States have acted upon a different construction of the Constitution since. They have, however adopted no uniform rule, and we have seen, upon more than one

occasion, the embarrassment consequent upon the absence of a uniform rule. It was illustrated in the recent case of the gentleman who supposed himself to be a Senator from the State of New Jersey. I do not propose, of course, to argue that question again; but that was a difficult question, in the judgment of a great many; the Senate was nearly equally divided on the matter; and I think every member of the Senate who reflects upon the circumstances of that case, and the actual and honest differences of opinion which prevailed among ourselves, must have come to the conclusion that it is very desirable to adopt some uniform rule if we can do it. This bill proposes to adopt a uniform rule; it places it out of the power of the States to adopt any other; and not only that, but it makes it the imperative duty of the States to elect according to this prescribed rule."

" As has already been said, there can be no doubt about the authority to pass the bill before the Senate, and I have no doubt that the framers of the Constitution anticipated as very possible that the time would come when it would become necessary for Congres to interfere in this matter. They would not have made the provision except on account of an anticipation that the necessity for its exercise would subsequently arise. They therefore said in the Constitution that 'the times, places, and manner of holding elections for Senators' shall be prescribed in each State by the Legislature thereof; but the Congress may at any time, by law, make or alter such regulations except as

JUNE TERM, 1891.            463

State ex rel. F. P. F., Gov. v. J. L. C., S. of S.—Argument of Counsel.

to the place of choosing Senators." The selection of
the place they left entirely to the. authority of the
State; but as to how they shall elect the Senator, what
regulations shall be prescribed for that purpose, the
Constitution provided should be (if Congress should
see proper to exercise the power afterward) decided
upon by Congress. Why put that provision in the
Constitution? Is it not obvious that it was inserted for
the purpose of accomplishing some uniform regulation?
Congress cannot adopt partial regulations, regulations
to be enforced in Maine, and different regulations to
be enforced in Maryland. The regulations which Con-
gress are authorized to pass, and are only authorized
to pass, are regulations which are to apply equally to
all the States. The convention, therefore, looked to
the coming of a period when different regulations
might exist in the several States, or no regulation
might exist, which would render it the duty of Con-
gress, with a view to the interest and the safety of the
government, to guard against the mischief consequent
upon the absence of regulations, or the existence of im-
proper regulations, to provide for both cases."

Again, as the bill, as enacted, was about being or-
dered engrossed for a third reading, read the third
time and put upon its final passage, the following col-
loquy occurred between Mr. Williams and Mr. Clark,
the mover of the bill:

Mr. Williams. "I should like to ask a question with
reference to the language used in the twenty-ninth
line of the first section. It reads:

And the person having a majority of all the votes of the said joint assembly, a majority of all the members elected to both houses being present and voting.

"Is it intended by that phraseology to require a majority of each house, or a majority of both houses?"

Mr. Clark. "A majority of both present. There is to be a majority of the two, counting together as one body."

(The quotation from Mr. Johnson, and colloquy between Messrs. Williams and Clark, are to be found in The Congressional Globe, part 4, 1st sess. 39th Cong.. 1865-'66, pages 3732 and 3734, respectively.)

So there can be no doubt what the Congress meant.

Nor can there be any doubt that the *precise* constitutional question insisted upon by the Governor of Florida, by force of which *alone* can a failure of election be predicated, was thus, then and there met, and was thus, then and there disposed of, adversely to the Governor's view, by the only constitutional tribunal competent to decide the question. And since this statute was enacted, the Senate in its exercise of its undoubted constitutional prerogative to be "the judge of the elections, returns and qualifications of its own members" has uniformly, and in repeated adjudications, sustained the construction that this statute means what it says, and as thus construed is constitutional.

The provision of the State Constitution that "a majority of each house shall constitute a quorum to do

business," even in the absence of sec. 31, in Art. 3, of that instrument, would not be offended by this statute thus construed.

In ordaining that "a majority of each house shall constitute a quorum to do business," Sec. II, Art. 3, the people of Florida must be presumed to have had in mind the "legislative authority," vested by that instrument, under the limitations therein, set forth in Sec. 1 of the same article. This section declares, "The legislative authority of this State shall be vested in a Senate and House of Representatives, which shall be designated "The Legislature of the State of Florida." It is true, the people of Florida in and by this constitution *vested* whatever of legislative authority they possessed, under the constitution of the United States, the supreme law of the land, in this body, so designated as "The Legislature of the State of Florida," and they, in and by that instrument, have restricted that body in the exercise of the "legislative authority of this state," so vested in it, to the mode, and under the limitations therein enumerated; and by the plain provision thereof whatever that body does, under the legislative authority of the state so conferred upon it, must be done in strict pursuance of Sec. II of that article, and in strict subordination to all the other limitations of that instrument. But *that* body does not perform the function of electing a United States senator under the *"legislative authority of the State of Florida"* vested in it by the State

30

constitution. The *authority* and duty of electing United States senators, to be exercised by the body thus designated by the constitution of the state, and thus selected by the people of the state, under the operation of the constitution of the state, are imposed upon it by Art. 3, Sec. 3, constitution of the United States.

This proposition was distinctly asserted by the senate of the United States, Dec'r. 14, 1887, in declaring that Charles J. Faulkner was entitled, and that Dan B. Lucas was *not* entitled, to a seat as senator from West Virginia. For the purpose of transacting business, the duty to transact which has been put upon the legislature of the State of Florida, by the Constitution of the United States, the members thereof are organized, when the House and the Senate have determined, each for itself, who have been duly elected thereto under the Constitution of the State, and when such members have been duly admitted to their seats. The Senate and House thereupon have become in the purview of the Constitution of the United States, the Legislature of the State of Florida, competent to elect a senator.

The case arose in this way. The term of Mr. Camden, as a senator from West Virginia, expired on the 4th day of March, 1887; the regular biennial session of the legislature, begun on the second Wednesday of the preceding January, upon whom the duty devolved of electing his successor, proceeded to ballot for this purpose, but adjourned without making a choice.

Thereafter, in the recess of the legislature, March 5th, 1887, the Governor appointed Mr. Lucas to fill the vacancy, "until the next meeting of the legislature *having authority* to fill such vacancy." And, on the same day, the Governor, under Art. 7, Sec. 7 of that State, which is as follows : "The governor may on extraordinary occasions convene at his own instance the legislature, but when so convened, it shall enter upon no business, except that stated in the proclamation by which it was called together,"—issued his proclamation convening the legislature in special session, and specially designated eight well defined subjects of legislation. And the legislature in pursuance of this call convened in April 1887, and proceeded to elect Mr. Faulkner to fill the existing vacancy in the United States Senate.

The following December upon the opening of Congress, Mr. Lucas presented his certificate of appointment, and Mr. Faulkner his credentials based on the proceedings of this special session. Mr. Lucas contended that the constitution of the State limited the authority of the special legislature, in the "transaction of business," to the subjects enumerated in the Governor's proclamation. The matter was referred to the Committee of Privileges and Elections, who thus disposed of Mr. Lucas' claim : "But it seems to the committee that the construction of the State Constitution of West Virginia upon which the above argu-

ment is based is one which will not bear examination. When that Constitution provided that the legislature so convened in extraordinary occasions "should enter upon no business except that stated in the proclamation by which it was called together," the people must be presumed to have had in mind business to be transacted under authority of the State Constitution, and not to have intended to prohibit the performance of duties imposed upon it by the supreme authority of the Constitution of the United States."

But if any doubt did heretofore exist in regard to this matter, it has been removed, by the people of Florida, who have declared in Sec. 31 of the article organizing the legislative department, constitution of 1385, as follows :

"The legislature shall elect United States Senators in the manner prescribed by the Congress of the United States and by this Constitution."

We have seen that the people of Florida had no authority to vest in "The legislature" the power to elect senators. The legislature got this power from the Constitution of the United States. But to the extent they had the authority to delegate the control of the manner of electing United States Senators, they wished to put it in the *organic* law that the legislature should elect according to the manner prescribed by the Congress. This manner, thus prescribed, had been, there-

tofore, prior to 1885, repeatedly construed by the United States Senate; and *this* construction must have been known by the eminent constitutional lawyers who composed the convention and re-inserted this provision in the Constitution of 1885.

The suggestion has been made, however, that there is a qualification upon. "the manner prescribed by the Congress of the United States," found in the words "and by this constitution." To this the obvious answer is, if there be a "manner" of electing United States Senators, prescribed by the Constitution of Florida, and there is none—that "*manner*," so prescribed by the Constitution of Florida, if it be other, or different from that prescribed by the act of Congress, is directly, and in terms, offensive to the Constitution of the United States which declares that "the times, places and 'manner' of holding elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof; but the Congress may at any time, by law, make or alter such regulations, except as to the places of choosing Senators;" and is therefore null and void. Congress having made the regulation prescribing the "manner" of electing United States Senators, in pursuance of this constitutional mandate, *any* manner, *other* or *different* from that so prescribed, is struck down by Art. 6, sec. 2, of the Constitution of the United States, which is as follows: "And the judges in every State shall be bound thereby,"—that is by the Constitution, and the laws of

the United States, which shall be made in pursuance thereof—" anything in the Constitution or laws of any State to the contrary notwithstanding."

It is obvious the courts of Florida have no jurisdiction to compel the Secretary to do what he is sought to be coerced in doing in this writ. The same considerations, limiting the legislative authority vested in the Legislature of Florida, control the judicial power of its courts.

The language of the Constitution vesting judicial authority in the courts of the State, is " the *judicial power of the State* shall be vested in the Supreme Court, Circuit Court, Criminal Courts, County Court, County Judges and Justices of the Peace." In the case of the State ex. rel. Bisbee vs. Board Co. Canvassers, when the jurisdiction of the court was challenged upon the ground " the particular office for which the relator seeks to compel the canvass of returns is that of representative in Congress," the court replied that if the relator "was entitled to a certificate of election from the officers of the State, according to the laws of the State, the State courts have power to aid him." " The judicial power of the State " is then, by the language of creation, as well as by its essence and purposes, as limited in its scope, as the legislative authority of the State, under its Constitution is limited. The judicial power cannot transcend its source.

But as the Legislature of the State is, so to speak, an agent of the Federal Constitution, selected by it to

elect Senators to the Federal Congress, and is wholly independent of the State Constitution in respect of this source of power, so the Governor of the State is wholly independent of the State Constitution in respect of his power derived from the Federal Constitution to fill by appointment vacancies in the office of United States Senator. Indeed, he is, in this respect, wholly independent of the State Constitution, and independent also of the laws which may be passed thereunder, in respect of the form or manner of exercising this appointing power, as he is in respect of the mode he may adopt in evidencing to the Senate of the United States this exercise of the power so conferred upon him by the Constitution.

Under sec. 4, subdivision 1, Art. I, of the Constitution of the United States, "the time, place and manner of holding elections for Senators and Representatives" in each State are to be prescribed by the Legislature of each State, subject to the paramount right to Congress to make or alter such regulations as to the time and manner.

But Congress has no right to prescribe, nor has the State any right to prescribe the time or manner, or mode of certifying the appointment of the Governor of Senators to fill vacancies. In the exercise of his appointing power the Governor of a State, under the Constitution of the United States, is exempted from

any interference or control, by any authority, legislative or judicial, Federal or State. It is purely a political power.

Upon this theory the entire Federal legislation is based. The act of Congress, in that behalf, recognizing these *limitations*, while it makes or seeks to make it the duty of the Executive of the State from which any Senator has been chosen to *certify* his *election*, under the seal of the State, to the President of the Senate, and requires the Secretary to countersign such certificate, does not make or seek to make any certificate or sealing the evidence of or necessary to the exercise by the Governor of the appointing power. It seeks to give no direction or instructions to him in the premises. It leaves him, just where the Constitution of the United States leaves him, absolutely untrammeled in the exercise of his absolute power of appointment.

The want of jurisdiction in the court to issue the peremptory writ, its exercise involving as it does the adjudication that an alleged election was invalid, is established by this court in Weeks vs. Gamble, 13 Florida, 1; Ex. Parte DuBose, 54 Ala., 278.

The absence of a proper party, and the presence of an improper party, in and from the writ, is shown, the State ex rel. vs. Cone, 17 Fla., 707; McBride vs. Kent Co. Sup., 38 Mich, 421; Atty. Gen. vs. Detroit Police Justice, 41 Mich., 224; People vs. Regents, 4 Mich., 98; Delbridge vs. Green, 29 Mich., 121; Atty. Gen. vs. Al-

bion Academy, 52 Wis., 469; Att. Gen. vs. Boston, 123 Mass., 460.

The insufficiency of the allegations, and the non-liability of the Secretary to be compelled by mandamus: McClellan's Dig., p. 934, sec. 6; *Ibid*, p. 184, sec. 3, ch. 12, 1845, sec. 1; U. S. Dig., sec. 19.

RANEY, C. J. :

That the writ of mandamus lies to require the performance of a clear official duty, not involving discretion, by any one of the "administrative officers of the executive department" of this State, (secs. 5, 17, 20, 28 of Art. IV, Constitution of 1885,) is a settled proposition of law in Florida, Towle vs. State *ex rel.* Fisher, 3 Fla., 202; State *ex rel.* Weeks vs. Gamble, 13 Fla., 9; State *ex rel.* Bloxham vs. Board of State Canvassers, 13 Fla., 55; State *ex rel.* Drew vs. Board of State Canvassers, 16 Fla., 17; State *ex rel.* Bisbee vs. Board of State Canvassers, 17 Fla., 29; State *ex rel.* Bisbee vs. Drew, 17 Fla., 67; State *ex rel.* Moody vs. Barnes, 25 Fla., 298. To hold that the mere fact of these officers belonging to the executive department of the government should exempt them from this judicial process as to a plain ministerial duty or where they are given no official discretion, would be inirreconcilable antagonism to a consistent line of judgments running back over forty years. There is moreover nothing in the five cases specially called to our attention in behalf of

474    SUPREME COURT.

State ex rel. F. P. F., Gov. v. J. L. C., S. of S.—Opinion of Court.

the defendant, and noticed in the next paragraph of this opinion, to cause us to doubt the correctness of the conclusion reached by our predecessors; even though the conclusion was arrived at in the face of conflict of authority—a condition not unfrequently confronting appellate courts.

The case of Commonwealth vs. Wickersham, 90 Penn. St., 311, holds that the writ did not lie in the Court of Common Pleas against the defendant, who was Superintendent of Public Instruction, as that court had never been given power to issue it against State officers. It is stated, however, in the opinion of the Judge of the Common Pleas, which opinion is adopted by the Supreme Court, that by an act of May 22, 1792, which continued in force until abrogated by a convention held in 1872-3 for forming a new Constitution, (Com. *ex rel.* Butler vs. Hartranft, 77 Penn. St., 154,) such power had existed in the Supreme Court, and that no inconvenience was ever felt from its exercise by that tribunal, but the Convention limited the power, as an exercise of original jurisdiction, to cases against inferior courts, and that the Legislature had not given to any inferior court the power now invoked. The decision in State *ex rel.* vs. Hobart, 12 Nev., 408, is that the office of State Comptroller, which Hobart held, was one of public trust and conferred upon the individual for the benefit of the public, and if the acts which he refused to perform concern the public in-

JUNE TERM, 1891. 475

State ex rel. F. P. F., Gov. v. J. L. C., S. of S.—Opinion of Court,

terests and are such as the law requires to be per-
formed by him, the writ of mandamus should issue to
compel the performance of the duty. The writ was is-
sued. In State *ex rel.* vs. Hayne and Mackay, 8 Rich.,
367, it was decided that the Supreme Court has juris-
diction by mandamus over the executive officers of the
State, as, for instance, the Secretary of State, and
might by such writ supervise, control and direct their
duties, the duty in the particular case being minis-
terial. The conclusion reached in Bledsoe vs. Inter-
national R. Co., 40 Texas, 537, in so far as the Comp-
troller was concerned, was that the duty in question
was not a mere ministerial duty, but it was his duty to
see that preliminary work proper to be done had
been performed; and that the District Court had not
power under the Constitution to compel an officer of
the executive department of the government to per-
form an official duty, and that whereas under the
former Constitution the supreme executive power was
vested in the Chief Magistrate, under that then in
force it was vested in the entire body of the magistry
composing the executive department, with the powers
of each separately defined. The remaining one of the
particular cases cited in behalf of defendant, Dane vs.
Derby, 54 Me., 95, S. C., 89 Am. Dec., 722, does not
involve the question of a mandamus against a State
officer, and need not be noticed, and of the Texas case,
the only one requiring comment, it is necessary to say

merely that in Florida the "supreme executive power is vested in a Chief Magistrate, who shall be styled the Governor of Florida," sec. 1, Art. IV of the Constitution; and that two of the judges dissented from the conclusion reached by the other three.

It is not within the possibilities of any one opinion to review all the authorities referred to in the note to Dane vs. Derby, in the 89th volume of the American Decisions. This court long ago decided the question, and in doing so and in adhering consistently in past years to that decision, it has followed in the footsteps of Marshall and his associates, and others who have rested their conclusion upon the ground that ours is "a government of laws and not of men," and that where there is no right to exercise discretion in the premises any officer less than a Governor, acting as such, (as in State ex rel. vs. Drew, 17 Fla., 67, and cases therein cited,) is not exempt from this process of the law; and upon this theory it was held in Marbury vs. Madison, 1 Cranch, 137, that the Secretary of State would be the subject of a mandamus to compel him to deliver a commission which had been signed and sealed, and upon the same principle peremptory writs of mandamus have been awarded against other Secretaries of departments of the general government. Kendall vs. United States, 12 Peters, 524; United States vs. Schurz, 102 U. S., 378. See also Butterworth vs. Hoe, 112 U. S., 50. In Com. ex rel. Butler vs. Hartranft, 77 Penn. St., 154, the Supreme Court deplored the limitation,

referred to above, upon its former jurisdiction as a result which deprived the people of one of the forms of remedy essential to the interests of a republic; and we feel assured that it will not be denied that the history and practical utility of the writ in Florida entitles it to the highest consideration for effectually securing the performance of public official duty and establishing public right. It is the character of the duty, and not the nature of the office, which must, as long as the law is regarded, always control a court in deciding whether or not it will award a peremptory mandamus against an officer of the character of the respondent, Marbury vs. Madison, *supra;* Redfield vs. Windom, 137 U. S., 636, Boynton vs. Blaine, 139 U. S., 306; and this would be a late day for the Supreme Court of Florida to depart from this rule.

2nd. It appears that on the fourth day of August last the Governor issued an address to the people of Florida, announcing as his judgment and conclusion that the action of the joint assembly of the Legislature taken on the 26th of May last, at which Mr. Call received the votes of fourteen Senators and of thirty-seven Representatives, and Mr. Mays received the vote of one Representatative, and at which the President of the joint assembly announced that Mr. Call having rceived a majority of all the votes of the joint assembly, a majority of all the members elected to both houses being present and voting, was duly elected United States Senator for the term beginning March 4, 1891, was not an election of Mr. Call, and the reason,

as is shown by the return before us, is that a majority or quorum of the Senate was not present at, and did not participate in such election. In this paper the Governor also announced that he could not "in the discharge of his duty" certify that Mr. Call was elected, and gives a full statement of the grounds upon which his conclusions are based. On the 22nd day of September the Governor prepared and signed the appointment of Mr. Davidson set out in the preceding statement of the case before us, and it will be observed that this appointment recites that a term of office of United States Senator held by Mr. Call had expired on the third day of March last during a recess of the Legislature, and that thereby a vacancy happened in such office, and that no Senator had been chosen by the Legislature to fill such vacancy, and that the Legislature was not in session, but, on the contrary, a recess thereof existed at the time, and upon these premises so recited, the Governor by virtue of the authority vested in him by the Constitution of the United States appoints Mr. Davidson to be United States Senator from Florida until the next meeting of the Legislature.

The election mentioned is set up by respondent as a bar to the allowance of a peremptory writ. He says that by virtue of this action of the joint assembly on the 26th day of May, Mr. Call was duly and constitutionally elected United States Senator, and that consequently no vacancy existed when the Governor made the alleged appointment, the vacancy occurring on ex-

piration of Mr. Call's previous term having been filled by such election. The respondent also supplements this defense with the statement that Mr. Call applied to and obtained from him, as Secretary of State, a duly certified copy of said proceedings to be presented to the Senate of the United States as the due and legal evidence of his election as such Senator.

The Constitution of the United States provides: That the Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof, and (after directing how they shall be classified as to length of terms) ordains that if vacancies happen by resignation or otherwise during the recess of the Legislature of any State, the Executive thereof may make temporary appointment until the next meeting of the Legislature, which shall then fill such vacancies, sec. 3, Art. I; and that the times, places and manner of holding elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof, but Congress may at any time by law make or alter such regulations, except as to the place of choosing Senators, sec. 4, Art. 1; and that each house shall be the judge of the elections, returns and qualifications of its own members, sec. 5, Art. I.

The Constitution of the United States has not elsewhere given to this court the power to pass upon the question of the legality of the election of a United States Senator, but by the last of the provisions quoted above it has expressly excluded from it the right to do so. The Constitution of the State has not attempted to

confer any such power upon us, nor has Congress, nor our own Legislature; nor is it to be imagined that any such attempt would be made. Whether Mr. Call was legally elected by the Legislature, is not for us to say. Our predecessors, when asked in January, 1869, under the power given the Governor by the Constitution, to require their opinions "upon any point of law," whether the election of Mr. Abijah Gilbert as Senator in 1868 was legal, replied in effect that the Senate of the United States was the exclusive judge of the elections, returns and qualifications of its own members, and whether an election of a Senator by a State Legislature was in conformity with such regulations as are prescribed by Congress, or whether, for want of strict conformity therewith, it was illegal and void, were questions which the court had no jurisdiction to decide. Advisory Opinion, 12 Fla., 686. That we have not jurisdiction to entertain the question of the legality or illegality of Mr. Call's election is palpable, and that anything we might decide about it, should we so far forget ourselves as to enter upon its consideration, would be inexcusable usurpation and of no effect whatsoever cannot be denied. Whether the Legislature has in its action so far complied with the true intent and meaning of the statute of the United States governing such elections, or whether that statute, if it contemplates legal action in the absence of a quorum of either of the houses where the organic law makes a quorum essential to the transaction of business, is

constitutional, are questions for the Senate alone to decide.

The question occurs to us, however, that admitting we cannot decide upon the legality of the election, is it not a sufficient answer to the application for this writ, that the joint assembly is shown to have done what it in fact did and as it was constituted, and to have announced through its presiding officer the same to be a legal election. It is we find, after the most careful consideration, impossible to pursue this course without usurping the functions of the Senate. As shown above, the Executive of a State may, if a vacancy happens during the recess of the Legislature, make temporary appointments until the next meeting of the Legislature, which shall then fill the vacancy, and it is unquestionably the primary function of the Executive, subject solely to the judgment of the United States Senate, to decide when any such vacancy exists. The correctness of his decision, and the legality of his action in making an appointment is a matter entirely beyond our jurisdiction. Whether the Constitution gave the Governor power after the adjournment of the Legislature to appoint, was a question which addressed itself primarily to the Governor, and however erroneous may be the conclusion which he has reached, he has in fact made a decision in favor of his power, and has proceeded to the extent indicated by this record, in making an appointment to fill what he holds to be a vacancy within the meaning of that clause of the Constitution which confers upon him the power of appointment.

31

We cannot close our eyes to this fact as an existing feature in the case before us any more than to the action of the Legislature or any other fact shown by the record. It cannot be said that as between the Governor and this court, it was not a matter for his decision. We cannot hold, then, that the simple fact of the Legislature having taken the action set up constitutes a bar to the proceeding sought at our hands, without usurping the power to decide that this action, however illegal or ineffectual it may be held by the Senate, precluded any action by the Governor; or, in other words, deprived him of the power to act. To decide this question would be to do what the Constitution has devolved upon the Senate exclusively. It is a question as to the relative validity of legislative and executive action, of which we have no jurisdiction. What we cannot do, the Secretary of State cannot do, and for the same reason that the power has not been placed in him unless it is implied by the imposition upon him of the duty to seal and countersign this commission, if such duties have been put upon him is a question to be hereafter considered. He cannot, unless the power to do so is implied by the imposition of the stated duties, decide that the appointment of Mr. Davidson is illegal, or that it is so because the election of Mr. Call was legal, and no vacancy existed, and consequently the Governor had no power to appoint. ·The erroneous exercise of power by either the Governor or the Legislature confers no power on either the Secretary of State or us, and in our conduct we should leave the action

of each to be judged of by the Senate, and perform such duties as the law has placed upon us. without assuming any responsibility not imposed upon us. Knowledge on our part of what may have been the decision of the Senate in any analogous case does not create power or jurisdiction in this court. Unless there is in the nature of the act of sealing and countersigning, the implied power of passing upon the legality of the Governor's action, the Secretary has no more power to do so and refuse to attest the Governor's act than he would have had to refuse Mr. Call a certified copy of the proceedings of the legislature, of whose records he is, under sec. 21, Art. IV of the Constitution, the keeper, had it been his judgment that the election by the legislature was illegal and void. In certifying and giving such copy he performed a duty imposed upon him which in nowise involved or implied what his personal judgment of the validity of that election is, and the law does not give him any official judgment as Secretary of State in the premises.

III. It is, however, contended in effect, that the right to have this writ issued is dependent upon the right of Mr. Davidson to the office of Senator; or in other words, the legal right of the Governor to make the appointment. In support of this contention counsel for respondent cites the case of the State *ex rel.* Clarke vs. Trenton, 49 N. J., (Law), 349, which was an application by Clarke for a mandamus to compel the Board of Health of the City of Trenton to admit

him as a member of such board. It was a proceeding to put him in physical possession of an office. Clarke had been nominated by the President of the Council, who had assumed to act as Mayor when he understood the Mayor was absent from the city, and his nomination had been confirmed by the City Council, to succeed one Cloke whose term of four years had expired, but who under the law was authorized to hold until his successor should be appointed and qualify. Cloke still held his seat on the board and was recognized by it as a member, and it was contended by the board, the defendant, that the President of the Council had no authority to make the nomination, as the Mayor was not, at the time it was made, really absent from the city, such absence being a contingency necessary to the President's power, and the one which was assumed by him to exist and authorize the action taken. The court held that as it was not shown that the Mayor was not absent, there was no power in the President of the Council to nominate, or in the Council to recognize it, and that the nomination and confirmation were not proof of such absence, and that a mandamus would not issue. It was held that as the charter of the city had not provided that any particular certificate of appointment should be evidence of title to the office, therefore the case differed from those where the law provides that the certificate of an election board shall be evidence of the result of an election; but if the charter had provided for issuing a commission evidencing a right to membership in the

board, the contention that the nomination by an acting Mayor and confirmed by the Council would make out a conclusive title, *on an application of this kind* might be sustained.

It is true that mandamus will lie to compel the surrender of books, and papers, and buildings to one possessing certain *prima facie* evidence of title to the office, and this even though *quo warranto* may be pending to test the real title to the office; and the award of the writ of mandamus will have no effect upon the other proceeding, for mandamus is not the proper proceeding to determine the title to office as between contestants, and where the party seeking the latter writ has not muniments of title to the office which the law has made *prima facie* evidence, relief, even to the extent indicated above, will not be given if his right to the office is even doubtful. High on Ex. Legal Rem., Secs. 70, 73, *et seq.*; State *ex rel.* O'Donnell vs. Dusman, 39 N. J., (Law), 677; State *ex rel.* Law vs. Saxon, 25 Fla., 792, 796. It is however established by the overwhelming current of authority that where an office is already filled by an actual incumbent, exercising the functions of the office *de facto* and under color of right, mandamus will not lie to compel the admission of another claimant, or to determine the disputed question of title, and for the reason that an adequate and specific remedy at law exists, which is *quo warranto*, High secs. 49, 67; and in the New Jersey case relied on by respondent it is admitted that the relief in such cases is usually sought by *quo war-*

*ranto.* See also State *ex rel.* v. Gamble, 13 Fla., 9, 28; People vs. Mayor, 3 John. Cases, 79.

The distinction between the New Jersey case and the one before us is unmistakable. There the claimant to an office was seeking to oust one holding possession of it, and obtain possession himself, not in the ordinary way, but by a remedy never available except under peculiar circumstances, not then existing, and when available not conclusive of the question of title to the office. Here there is no question of the right of possession to the office. Besides our not having jurisdiction to try this question of title, neither of the parties who may claim the office of Senator under the election, or the appointment, is before us, and whatever we may decide, can in nowise affect the decision, of the right to the office, by the only tribunal which has any power or jurisdiction to decide that question. The contest before us is between the Governor as Governor, and the Secretary of State. The Governor claiming that he has, as the "Executive" of the State, the right to appoint a Senator, has exercised that power to the extent of signing an appointment and placing it with the Secretary and requested him to seal and countersign it. We have shown that the power to review the legality of the Governor's act is beyond our jurisdiction, as it is beyond that of the Secretary of State. In the case of the State *ex rel.* Bisbee v. Board of County Canvassers, 17 Fla., 9, it was contended that this court had no jurisdiction to award the writ of mandamus to compel the Board of

Canvassers to canvass the returns and declare the result
as shown by the precinct returns, because the partic-
ular office as to which the relator sought the relief
was that of Representative in the Congress of the
United States. Replying to this objection, the court,
after remarking that it was not pretended by the re-
lator that the canvassing of the votes determines his
right to this office, said : "That must be determined
by the House of Representatives. But the relator says
that the law of the State under which the election was
held entitles him if he shall appear to have a majority
of the votes according to the election returns, to a cer-
tificate of that fact." The relator was seeking to lay
the basis for getting a certificate of election by having
the county canvassers canvass the precinct returns, and
to transmit to the capital their own returns to be can-
vassed by the State board with other county returns.
All he could get as even the remote result of his litiga-
tion was a certificate of his election. The legality of
that election could not be passed upon by the court,
and this was the real substance of the board's objec-
tion, but it was held to be no reason for refusing the
writ. The legality of the election could not be con-
sidered, but the evidence of the result of an election
held under the laws of the State, and by its authority
could be enforced, and this, although it is the Consti-
tution of the United States, and not the State Constitu-
tion, which provides that "the House of Representa-

tives shall be composed of members chosen every
second year by the people of the several States, and
the electors in each State shall have  the qualifications
requisite for electors of the most numerous branch of the
State Legislature,'' sec. 2, Art. 1; and that '' the times,
places and manner of holding elections for  *  * Rep-
resentatives shall be prescribed in each State by the
Legislature thereof, but Congress may  at any time by
law make or alter such regulations,'' sec. 4, Art. I.
Again in State *ex rel.* Bisbee vs. Board of State Can-
vassers, 17 Fla., 29, where  the relator was seeking a
canvass by the State board, it was objected that he did
not show that he had  the requisite age for a member
of Congress, and the court replied :   '' This proceed-
ing seeks only to procure such certificate as the  candi-
date voted for may be entitled  to  under  the laws of
this State, which  certificate is  a  property which the
person obtaining the most votes is  authorized  by law
to demand.   Upon this enquiry the right to take and
hold the office is not in question,  and a slight examin-
ation of the rules laid down in the books does not show
that such a question has ever been  entertained  by the
courts.    Whether the relator possesses all the  qualifi-
cations necessary to entitle  him  to a  seat in Congress
can only be enquired into by the  House in  which  he
may present a certificate of election.''    Thus again the
court does not permit its jurisdiction and the  right of
the relator in procuring the evidence of an actual elec-

tion, to be defeated or interfered with by its inability to consider questions of the legality of such election.

That there can be any reason why the inability to enquire into the legality of the appointment of a Senator should bar the power to award a mandamus to require the perfection of the evidence of the actual appointment of a Senator, when it does not do so where evidence of election as a member of the other branch of the National Legislature is concerned, or why in the one case it should be necessary to pass upon the legality of the appointment before the relief can be granted, and not on the legality of the election in the other, and this too, when the authority to appoint is to be found in the same article of the same Constitution of the general government, is something which is not only beyond the comprehension of the court, but for which no explanation has even been attempted.

The case of People *ex rel.* vs. Farquer, Secretary of State, 1 Breeze, 104, is also relied upon in behalf of respondent. A careful consideration of it will disclose that the commission of one as Paymaster-General, which it was sought to have the Secretary seal and countersign, had been signed by the Lieutenant-Governor after the return of the Governor to the State. The Lieutenant-Governor had upon notice from the Governor that he would be absent from the State, assumed the duties of Governor, and although the Governor had returned and resumed the duties thereof, the

Lieutenant-Governor was still claiming to be the lawful executive of the State upon the theory that the Governor had by his absence from the State forfeited his office. It was held by the court that even assuming the Lieutenant-Governor to be the rightful Governor, the Constitution did not authorize him to make the appointment, as the office had never been filled or occupied. In answer to this it was contended by the relator that the Secretary was still compelled to affix the seal and countersign it. The court met this by relying upon the language of the statute which was that "all commissions required by law to be issued by the Governor shall be countersigned by the Secretary of State," and holding that the Secretary was "*only* required to countersign those commissions 'required to be issued by law.'" This language was in effect held to vest a discretion in the Secretary of State, yet not without the court's suggesting that if it was wrong on the point there was still ground for refusing the mandamus.

The marked distinction between this case and the one at bar is, that neither we nor the Secretary of State have the power to pass upon the Governor's act. It is a question between him and the United States Senate. The Illinois court, by assuming that the Lieutenant-Governor was rightfully the executive, could as against the relator applying for the relief, decide that the relator's appointment was illegal, there being no other

person occupying the office of Paymaster-General; State *ex rel.* Weeks vs. Gamble, 13 Fla., 9, 21, 28; but we cannot say that the Governor's act is illegal without usurping the jurisdiction of another tribunal.

If it is the legal duty of the Secretary of State to seal and countersign the appointment of Mr. Davidson, we are entirely satisfied, both upon reason and authority, not only that the inability of the court to enquire into the legality of the appointment is not a reason for refusing the writ, but also that a decision upon the legality of the appointment is not necessary to an adjudication of the question of awarding the writ.

4th. The foregoing conclusions bring us to the question, whether or not under the law obtaining in this State it is the duty of the Secretary of State to affix the seal of State to this commission and countersign the same.

The declaration of the Constitution, sec. 12, Art. XVI, that "the present seal of the State shall be and remain the seal of the State of Florida," implies that there is such a seal, as does the provision that "the Secretary of State * * shall be the custodian of the Great Seal of the State," sec. 21 Art. IV. It is not denied that there is such a seal, nor that the respondent is the actual and legal custodian thereof. There can be no doubt that the purpose of a seal of State is to authenticate, or prove the gen-

uineness of charters, grants and other public instruments emanating from the State. England, from whom we inherit governmental customs or law not peculiar to ourselves, first adopted a great seal in the eleventh century, and its general use for authenticating grants and charters and other public instruments became established about the middle of the thirteenth century. The United States and every State has a great seal, and the adoption of one by the government is for the purpose of authenticating its acts and securing public recognition of the same as genuine. The public seal of a State proves itself, it is a matter of notoriety, and may be taken notice of as a part of the laws of nations acknowledged by all. The public national seal of a kingdom or a sovereign State is by common consent and the usage of civilized communities, the highest evidence and the most solemn sanction of authenticity in relation to proceedings either diplomatic or judicial that is known in the intercourse of nations. Griswold vs. Pitcairn, 2 Conn., 85; Church vs. Hubbart, 2 Cr., 187; Santissima Trinidad, 7 Wh., 283; 2 Blackstone's Com., 346-7; Story's Conflict of Laws, sec. 643; Tomlin's Law Dict., Title : Great Seal of England. The Constitution of our own State, sec. 14, Art. IV, has directed that "all grants and commissions shall be in the name and under the authority of the State of Florida, sealed with the great seal of the State, signed by the Governor, and countersigned by the Secretary of State," and our

statue law has made it the duty of the Secretary of State to " record all  *   * orders, messages and other official acts and proceedings of the Governor, and it is made the duty of the Governor before issuing any order, or other promulgation of any official act or proceeding (except military orders) to deliver the same or a copy thereof to the Secretary of State to be recorded.   Sec. 2, p. 933, McClellan's Digest.

We see from the provision of our own Constitution last quoted that the purpose of its framers, and the people who adopted it, was that all commissions issued by the State should be sealed with the great seal of State, signed by the Governor and countersigned by the Secretary of State.   That it is under this section, the official duty of the officers named to sign and countersign, and the duty of the Secretary of State, who, by another section of the same article, is made the custodian of the seal, and whose countersigning is an attending testimony of the authorized use of such seal, to seal all commissions emanating from the State is the only interpretation of the organic law that would not violate common reason. What is a commission in the sense in which it is here used?   It is written authority or letters patent issued or granted by the government to a person appointed to an office, or conferring public authority or jurisdiction upon him.   Bouvier, Tomlin, and Abbott's Law Dictionaries :   " Commission; United States vs. Reyburn, 6 Peters, 352.   The commission is not the appointment

itself, but it is the evidence of the appointment. Jeter vs. State, 1 McCord, 233. Where the appointment is evidenced by no act but the commission the two says Judge Marshall, in Marbury vs. Madison, *supra*, seem inseparable, it being impossible to show an appointment otherwise than by proving the existence of the commission, which though not necessarily the appointment, is the conclusive evidence of it. The President's signature, says he, is the warrant for affixing the great seal to the commission, and it attests the verity of the President's signature; and that in all cases of letters patent certain solemnities are required by law as evidence of the validity of the instrument, and that in cases of commissions the sign manual of the President and the seal of the United States are these solemnities. In the United States vs. Le Baron, 19 How., 73, it was held that when a person has been nominated to an office by the President, confirmed by the Senate, and his commission has been signed by the President, and the seal of the United States affixed thereto, his appointment to that office is complete; that Congress might provide, as it had done in that case, that certain acts should be done by the appointee before he should enter upon the possession of the office under his appointment. That such acts became conditions precedent to the complete investiture of the office, but they were to be performed by the appointee, not by the executive; that all the executive could do to invest the

JUNE TERM, 1891.    495

State ex rel. F. P. F., Gov. v. J. L. C., S. of S.—Opinion of Court.

person with his office has been completed when the commission has been signed and sealed; and when the person has performed the required conditions his title to enter on the possession of the office is also complete. Judge Wescott speaking for the Justices of this court under date of October 28th, 1875, said : "When the commission of a Justice of the Peace is signed and sealed, all that is necessary to his investiture of the office is complete. Under the practice in this State, all the conditions as to taking oaths, etc., are complied with before the commission issues. To him, upon the signing and sealing the commission, belongs the office. Advisory Opinion, 15 Fla., 735, 738-9. See also People vs. Murray, 70 N. Y., 521; Mechem on Public Officers, section 114. In Conger vs. Gilmer, 32 Cal., 75, it was held that an appointment to office by a Board of Supervisors was not complete until the appointee had received the certificate of the same under the seal of the Board signed by the proper officers, but the rule was different in cases of election by the people; and in State vs. Cornell, 21 Ind., 516, that where the title to an office is derived solely by executive appointment the commission of the executive is the only legal evidence of such title.    See also People vs. Whitman 10 Cal., 38.

There can be no doubt that the word "commissions," as used in the above section of our constitution at least includes appointments to office. The provision in the constitution of the United States, that the Executive of any State may under the circumstances

therein specified "make temporary appointments" of Senators, carries with it the power to issue written evidence of any such appointment, and not only this, but it also implies the duty to do so. It imports that the executive authority of the State shall execute such evidence of the authority of the appointee as can be presented to the Senate of the United States and be passed upon by that body. Such credentials must, in the very nature of things, to serve these ends, be written, and cannot be in parol. In the case of People vs. Murray, *supra*, the view of the court is that there cannot be an appointment to office by parol or word of mouth, unless it was permitted by the terms conferring the power, and we are satisfied that none other than a written appointment is practicable, or is within the meaning of the words of the constitution. The way in which things have for a long series of years been done by those legally authorized and required to do them is a safe index to the intention of the lawmakers as to how it was intended they should be done; and an examination of the proceedings of the Senate shows in each of the numerous cases we have been able to find that the "credentials" of the appointee were presented to the Senate, and in every instance but one the entry is that they were also read before the appointee was seated and the oath of office was administered to him, the excepted case being one where the Senate was not organized when the credentials were presented. See Case of Niles, Senate Journal, December 21, 1835, p. 43; Case of Atherton, Cong.

Globe, December 1, 1845, p. 1; Case of Whyte, Cong. Globe, July 14, 1868, p. 4024, and the Case of Key, Cong. Record, December 6, 1875, p. 165.

. Any written appointment of a person to an office by the Governor of this State is a commission, and the express fiat of the constitution is that all commissions issued under the authority of the State shall be signed by the Governor, and sealed with the great seal of State, and countersigned by the Secretary of State. The purpose of the Constitution is that the warrant of all persons professing to represent the authority of the State shall be in the form indicated, and none other. The authority to appoint to an office, or to delegate the exercise of the State's power, contemplates conformity to this section of the Constitution, in making the appointment; and this section makes it the duty of the officers named whenever the power of appointing is exercised, to see that the commission or written evidence of the appointment is signed and authenticated as therein directed.

It is contended that this provision of the State Constitution is not applicable to the case at bar, for the reason that the power to appoint is not found in, or conferred by, the State Constitution or any law of the State; or, as it is otherwise put, because it is found in, or "conferred solely by, the Constitution of the United States, the supreme law of the land." Counsel for respondent, while conceding that under the Federal Constitution, the time, place and manner of holding elections for Senator and Representatives are

to be prescribed by the State legislatures, subject to the paramount right of Congress to make or alter such regulations, except as to the place of choosing Senators, yet says: "But Congress has no right to prescribe, nor has the State any right to prescribe the time or manner or mode of certifying the appointment of the Governor of Senators to fill vacancies. In the exercise of his appointing power the Governor of a State under the Constitution of the United States is exempted from any interference or control by any authority, legislative or judical, Federal or State. It is purely political;" and upon this theory he asserts the entire Federal legislation is based, it regulating the manner of certifying an election, but saying nothing as to certifying an appointment.

The Governor of a State in appointing a Senator, exercises an executive function of the State, and it is none the less so because the power is conferred by the Constitution of the United States upon "the executive." The authority is conferred upon the executive power of the State, and not upon any functionary or creature of the Federal government, and is inherent in that power, however it may be constituted by the State, and whether it be lodged in one Governor or an Executive Council of three or more, or otherwise. The purpose of the provision is to preserve the perpetual representation of the State in the Senate, and an appointment made by the Governor of Florida is the exercise of State authority, and none the less so because the State derives it from the Federal Constitu-

tion. He does it as the executive and officer of a State, and not as an officer of the United States. The legislature of a State in electing a Senator acts for an l represents the State, and does so as the legislature of the State, and in the exercise of the State's right to be represented in the Senate or government of the United States by Senators thus chosen. That it is the duty of the legislature to elect, a duty not only to the State, but also to the general government in view of the nature of our government, cannot be denied, but the duty does not change the character of the body and make it a Federal legislature. The grant to Congress of power to alter and make regulations as to the elections of Representatives and Senators was founded on the possibilty that the State legislatures, agencies of the State might be remiss in the premises. The authority given to the State executive to appoint is not, except as to the mode of appointment, a limitation upon the State's power to choose its Senator, but was to preserve and execute that power and secure representation to the State through the action of its own executive under certain contingencies, and by the two processes the power of the State to choose its Senators at all times and under all circumstances preserved. Mr. Madison, in speaking of the selection of Senators by State legislatures, said: "It is recommended by the double advantage of favoring a select appointment and of giving to the State governments such an agency in the formation of the Federal gov ernment as must secure the authority of the former

and may form a convenient link between the two sys-
tems." And as to the equal numbers of Senators al-
lowed each State, he observes that it "is at once a con-
stitutional recognition of the portion of the sovereignty
remaining in the individual States for preserving that
residuary sovereignty. So far as the equality sought
to be no less acceptable to the large than to the small
States, since they are not less solicitous to guard by
every possible expedient against any improper consoli-
dation of the States into one simple republic." The
Federalist, No. 62, pp. 346-7.

In the absence of legislation by Congress providing
the form in which the appointment of a Senator shall
be authenticated, it is unnecessary to discuss the
power of Congress to legislate upon the subject. If
it has not such power, its deprivation of it is no reason
why the State cannot exercise it. The Senate has as
much power to enquire into the legality of the ap-
pointment of a Senator by the executive power of a
State, as into that of the election of one by a Legis-
lature. If it has not, any appointee can take his seat
in the Senate upon the assumption that the Governor
has appointed him and given him evidence of the ap-
pointment satisfactory to executive discretion. In all
cases of any alleged executive appointment a primary
question for the Senate is : Has the executive authority
of the State made an appointment? Its validity as
an executive appointment cannot be investigated until
it is satisfactorily shown that there has been an
appointment in fact by the executive. Under the Con-

stitution and laws of the United States and of this State there is no known mode of evidencing or proving that an appointment of a United States Senator, or any other officer, has been made by the executive of this State, except, or unless and until, a commission has been duly signed, sealed and countersigned in accordance with the above quoted provision of our organic law, sec. 14, Art. IV, Constitution. It is true that it is the duty of the Secretary, under a statute referred to above, to record all commissions, like any other executive act, but this duty does not arise, nor can it be legally performed until the commission has been signed, sealed and countersigned, as is clearly established by the cases Marbury vs. Madison, and United States vs. LeBaron, *supra*, and implied in the advisory opinion of October 28th, 1875, for until then it is not complete, and even if the incomplete commission should be permitted to remain in the Secretary's office, no certified copy of it would be effectual to prove the appointment, for until complete, it is not legal evidence of the title to the office. The law does not contemplate that it shall remain in the office, but that it shall be recorded as soon as complete, and be delivered to the appointee, as the evidence of his title. When complete it is the appointee's property, and its surrender to him may be compelled by mandamus brought on his relation. Marbury vs. Madison, *supra*.

In the absence of any provision in the Constitution or statutes of the United States, when a Governor of this State wishes to appoint a Senator the only legal

way of evidencing his act so as to command the recognition of it by the United States Senate as his official act, is to comply with the formula which the people of the State have in our Constitution declared to be the proper form for exercising the executive power of appointing to office. Any appointment of a Senator not thus signed, sealed and countersigned is not authenticated in the manner which our organic law, the only law regulating the subject, provides, and is not entitled to recognition by the Senate of the United States as a commission or appointment as United States Senator from the State of Florida, or its executive authority acting for the State. Assuming that Congress has the authority to prescribe how such an appointment should be authenticated, until it does so the only reasonable conclusion is, that this executive act of the State government shall be evidenced in the manner provided by State law in such cases, and the only appointments or commissions of Senators extended upon the proceedings of Congress within our reach, appear to have been signed by the Governor, sealed with the great seal of State, and attested or countersigned by the Secretary of State. We have been unable to find anything that suggests any other possible way of evidencing the executive act than that provided by the provision of our own organic law, nor is there in the Constitution of the United States anything that prevents the State from regulating the evidence of this official act, at least until Congress shall act in the premises. The Governor, as the representative of the State, and her chief executive

power, whose duty it is to see that the laws are enforced, is seeking to have an act done by him as her chief magistrate, authenticated in the only manner that it can be done to command recognition of it as done by him, and in our judgment he is, as her representative, entitled to have it done, unless there is in the nature of the act required of the Secretary of State something involving the exercise of official discretion.

It is in our judgment clearly the official duty of the Secretary to affix the seal of the State to the appointment, and to countersign or attest the same as evidencing the official act of the executive authority of the State in appointing a Senator in the Congress of the United States, and this duty is one involving no official discretion or judgment on his part. . It the case of the State *ex rel.* Bienvenu vs. Wrotnowski, Secretary of State, 17 La. Ann., 156, a mandamus was sought to require the Secretary of State of Louisana to affix the seal of State and countersign a commission signed by the Governor appointing the relator sheriff of the Parish of Orleans. The Secretary replied that the Governor was attempting to issue the commission without warrant or authority of law, and in direct violation of the Constitution and laws of the State; that the office of sheriff was then held by another person under a commission which would not expire until the next regular election for the office in question; and that the Governor had no authority to supercede the incumbent sheriff. The statutes of Louisiana enacted that there

should be a public seal for authenticating the acts of
the government, and that the Secretary of State, who,
as in Florida, was a constitutional officer, should be its
keeper and affix it to all official acts, the laws alone ex-
cepted.    The Governor was vested with the appointing
power in certain cases, but it was not shown or pre-
tended in the opinion that he had legally exercised it
in the case.    "The Secretary of State," said the court,
is not to suspend his action to enquire why and where-
fore any appointment by the Governor is made.    His
duty is plain; he is not directed, but ordered by law,
to perform it.    When commissions from the Governor
need authentication, he shall affix his official signature
and the public seal of State, for these are official acts.
Whatever improvidence or illegality there may be in
the issuing of commissions, that concerns him not.
His authenticating any official act can never compro-
mit him; for he has no discretion to exercise regard-
ing it.    *    *    *    Were this right of supervision, which
is almost equivalent to a veto power, in the Secretary
of State, as it is seriously contended it is, it would, in-
deed, produce startling consequences.    The Secretary
of State could paralize at will constitutional appoint-
ments made by the executive.    *    *    *    The Secretary
of State cannot go behind commissions officially pre-
sented to him for authentication.    *    *    *    When
two commissions duly authenticated for the same office
are extant, and it becomes necessary to determine which

of the two appointees is legally entitled to the office, that issue, presented in a proper manner and at a proper time, can be entertained;  *  but the courts will not inquisitively seek to know upon what evidence the executive acted in the performance of a constitutional duty, at all events in advance of the consummation of an official act."

The distinction between the above case and that of State *ex rel.* vs. Farquer, *supra*, is clear.   There is no language in the Constitution of the United States or in our own which can be construed to give the Secretary any discretion or judgment as to whether the Governor's action in appointing a Senator is legal.

The duty devolved upon the Secretary of State in the case before us is merely to authenticate the commission signed and presented to him by the admitted rightful executive of the State.   It is purely ministerial, and involves no exercise of discretion.   There is from the very nature of the duty no place in it for the exercise of judgment.   It involves nothing but affixing the seal and signing officially.   It is entirely impossible for anyone to infer, from, or to find implied in, the simple duty of authenticating this evidence of an appointment of an office known to exist, and which, under certain circumstances, the executive of the State has authority to fill, the further duty or the power to question the legality of the exercise of the authority to appoint.   If such duty or power of enquiry exists at all,

then it covers every question as to the legality of the
appointment that can be made.    It extends not only to
the question of whether or not there is a vacancy, but
also to the appointee's qualifications as to age, resi-
dence or citizenship.    If it exists at all, then the power
conferred by the Constitution of the United States
upon the executive of a State to appoint a Senator is
not subject simply to the  exclusive jurisdiction of the
Senate as to the election or appointment and qualifica-
tions of its members, but to another jurisdiction, which
is the judgment of the Secretary of State, and has the
power to deny to the Governor the right of  the consti-
tutional evidence that he  has even  made an appoint-
ment.    If this power obtains in the case of an ap-
pointment of a Senator, it, arising as it must and alone
can from the mere duty  to authenticate a commission,
exists also in the case of every  justice of the peace,
county commissioner, or other county officer, and of
every State officer of whom under any contingency the
Governor may have the power to make an appointment.
In so far as the existence of the power is concerned,
there is no  possible distinction in the several cases.
To say that it would not be exercised, is no answer, but
is an assumption of the existence of the power.  Knowl-
edge as to when, or by whom the power, if its exercise
is recognized, will be used or  renounced,  is not a sub-
ject for our consideration.

    In authenticating  the executive appointment of a

Senator, the Secretary of State in nowise commits himself to the legality of such act. The Governor is not responsible to the Secretary, nor the Secretary for him. If the act is illegal, the authentication of the Secretary is the .evidence of its consummation; it prooves what the Governor has done, but it does not involve the Secretary in responsibility for it. The Secretary's certificate to the transcript of the legislative proceedings furnished Mr. Call is official evidence of what those proceedings in fact were, and nothing more, and in nowise implies any opinion of his as to the regularity or legality of such proceedings, and the same is true, no less nor any more, of his authentication of the executive act in question. Nor does the appointment, though duly authenticated, have any effect upon the legality of Mr. Call's election, or towards creating any vacancy which does not otherwise exist. If an award of the writ would have any such effect, we would, and upon the plainest principles should, refuse to award it, and for the reason that Mr. Call is not before the court, nor is Mr. Davidson, and mandamus is not the remedy for settling a conflict for an office, even where the right to decide such a contest is in the court, which is not the case here. People vs. Farquer, *supra;* People vs. Mayor *et al.* of New York, 3 Johns. Cases, 79; State *ex rel.* Vienne vs. Hyams, 12 La. Ann., 719, cited in 17 La. Ann., 163.

5th. It is also contended that neither the State nor the Governor has any such interest in relation to the

specific act sought to be enforced as authorizes or jus-
fies the institution of this suit.

It is entirely clear from the authorities, Marbury vs.
Madison, United States vs. Le Baron, and Advisory
Opinion, *supra*,' and what has been announced in pre-
ceding portions of this opinion, that the executive or
governmental duty of completing a commission is not
consummated until it has been sealed and counter-
signed. Even admitting that when a commission has
been signed and delivered by the Governor to the Secre-
tary of State, the appointee named therein, who may
have previously taken the oath and given bond or done
anything necessary to justify him in entering into the
office upon the perfection of the commission, has such
a private interest therein as gives him a status to re-
quire through the instrumentality of this writ the seal-
ing and countersigning, or admitting that the execu-
tive power of revoking his action has passed as soon
as a commission so signed has been delivered to the
Secretary, or even as soon as it has been signed with
the intention of such delivery, these positions and con-
cessions, if proper, are in no way inconsistent with, nor
do they affect, the interest of the public in the appoint-
ment and commissioning of public officers, nor do they
remove the fact that the Governor is charged with the
" care that the laws be faithfully administered," sec. 6,
Art. IV, Constitution. The commissioning of a public
officer is not at any stage of its progress a mere mat-
ter of private interest. The entire public are directly
interested in the consummation of his appointment in

order that he may perform the duties of his office, which duties and the necessity of the performance thereof to the public, account not only for the appointment, but for the creation of the office itself. Of this interest of the public in having office filled, and commissions sealed and countersigned, or completed, so that the title of the office shall vest in, and the performance of its duties become incumbent upon, the appointees, the Governor is the constitutionally designated representative or trustee of the people, and as such he has the right, and it is his duty to take such measures as will secure the benefits of the same to the people. The duty of commissioning officers cannot in reason, nor without great detriment to the public, ·be transferred to inchoate appointees. If it is thus transferred, and the the Secretary of State shall refuse to authenticate appointments which the Governor may deem it his duty to make, the filling of offices will depend, not upon official duty, but on the financial ability and the disposition of appointees to litigate. It will remit to the private citizen, and impose upon private resources, a public duty which the Supreme Court of the United States and our own court tells us is not performed until the commission is complete. The Governor in presenting the petition for this writ has acted in his official capacity and in behalf of the State, and not in behalf of any private interest. In Kentucky vs. Dennison, 24 How., 66, 97, it is said : " In the case of Madraso vs. The Governor of Georgia, 1 Pet., 110, it was decided, that in a case where the chief mag-

istrate of a State is sued, not by his name as an individual, but by his style of office, and the claim made upon him is entirely in his official character, the State itself may be consider a party on the record. This was a case where the State was the defendant; the practice, where it is plaintiff, has been frequently adopted of suing in the name of the Governor in behalf of the State, and was indeed the form originally used, and always recognized as the suit of the State.'' It is the settled law, that where writs of mandamus issue, as they may, upon the relation of a private citizen, to compel the performance of a public duty, the interest in which is common to the whole community, the State is the real plaintiff. State *ex rel.* Scott vs. Board of County Commissioners, 17 Fla., 707; Hamilton vs. State *ex rel.* Bates, 3 Ind., 452; County of Pike vs. State *ex rel.* Metz, 11 Ill., 202; City of Ottawa vs. People *ex rel.* Caton, 48 Ill., 233; People *ex rel.* Case vs. Collins, 19 Wend., 56; People *ex rel.* Stephens vs. Halsey, 37 N. Y., 344; State *ex rel.* Rice vs. County Judge, 7 Iowa (Clarke) 186, 202. The Special interest of the private relator is important only where the matter is one solely of private right. Whether we hold the State or the Governor, as the chief executive, to be the real plaintiff in this case, we have no doubt of the power or duty of the Governor to act. State *ex rel.* Mahan vs. Dubuclet, 22 La. Ann., 602.

6th. That there is no other adequate remedy, is clear from the fact that the commission must be complete before it can be recorded, or a copy of the original can

be evidence of the appointment. "In the case of commissions, the law orders the Secretary of State to record them. When, therefore, they are signed and sealed, the order for their being recorded is given." Marbury vs. Madison, 1 Cr., 161. Until signed, sealed and countersigned, there is no legal evidence of an appointment of which a certified copy can be made.

7th. Upon the case made by the pleadings, our conclusion is; that the peremptory writ should be awarded but, in view of the character of the parties, we will suspend until Monday next any formal order in the premises, further than one adjudging the return of the respondent insufficient and sustaining the demurrer thereto.